**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RONALD TURNEY WILLIAMS,
            *Petitioner-Appellant,*

v.

TERRY L. STEWART, Director of
Arizona Department of
Corrections,
            *Respondent-Appellee.*

No. 01-99015

D.C. No.
CV 95-01687-RCB

OPINION

Appeal from the United States District Court
for the District of Arizona
Robert C. Broomfield, District Judge, Presiding

Argued and Submitted
November 17, 2005—San Francisco, California

Filed March 28, 2006

Before: Mary M. Schroeder, Chief Judge,
Pamela Ann Rymer and Ronald M. Gould, Circuit Judges.

Per Curiam Opinion

## COUNSEL

Julie S. Hall, Tucson, Arizona, and Denise I. Young, Tucson, Arizona, for petitioner-appellant Ronald Turney Williams.

Terry Goddard, Attorney General, Phoenix Arizona, Kent E. Cattani, Chief Counsel, Capital Litigation Section, Phoenix, Arizona, and John Pressley Todd, Assistant Attorney General, Phoenix, Arizona, for respondents-appellees Terry L. Stewart, et al.

## OPINION

PER CURIAM:

Ronald Turney Williams appeals from the denial of his 28 U.S.C. § 2254 petition. A jury convicted him on February 10, 1984, of first degree murder and armed burglary in the first degree for breaking into a home, burglarizing it, and shooting and killing someone who saw him, John Bunchek. Williams was sentenced to death on the murder conviction and to an aggravated term of fourteen years for the burglary conviction.

The Arizona Supreme Court affirmed, *State v. Williams*, 166 Ariz. 132 (1987), *cert. denied, Williams v. Arizona*, 500 U.S. 929 (1991), *reh'g denied*, *Williams v. Arizona*, 501 U.S. 1265 (1991), and denied his petition for post-conviction relief. We affirm Williams's conviction and affirm his sentence.

I

John Bunchek, an elderly Scottsdale resident, was shot and killed on March 12, 1981. A white male who had been seen wandering around the neighborhood just before the shooting knocked on the Bunchek's door and asked Sylvia Bunchek whether her next-door neighbors were home. Mrs. Bunchek told him that they were not. Mrs. Bunchek saw the stranger walk toward the neighbors' (the Tancoses') house. She expressed concern to her husband when he arrived a few minutes later. He went to investigate. When he failed to return, Mrs. Bunchek went to the Tancos house where she found her husband lying face down in a pool of blood, having been shot in the chest. John Bunchek ultimately died from the wound.

In addition to Mrs. Bunchek, five other witnesses saw the stranger in the neighborhood that day. Brenda Wood and William Koranda had talked with him face-to-face; Alan and Elizabeth Tautkus saw him for about five seconds as they drove by in their car. Wood and the Tautkuses provided the police with a description from which a composite sketch was prepared. This sketch was televised and published in local newspapers on March 13. It was seen by one of Williams's roommates, Lynn Walsh. Williams rented a house that was about three minutes from the Tuatkus home with Walsh, James McClaskey and Cheryl Le Duc. Walsh told McClaskey and Le Duc that the drawing looked like "Randy." "Randolph Cooper" and "Randy Despain" were names that Williams testified he used while he was in Arizona. The roommates looked at the drawing and made the composite face look thinner and more bearded. McClaskey then called Silent Witness and reported their suspicions that Williams was the suspect.

Meanwhile, without telling anyone, Williams "threw his stuff in the trunk of the car" and took off from Scottsdale the day of the murder. He was arrested after a shoot-out with FBI agents in New York City on June 8, 1981.

An Arizona grand jury indicted Williams and, following an extradition hearing, Williams was arraigned on April 3, 1983. Counsel was appointed for him, but Williams elected to represent himself at the guilt phase with the assistance of advisory counsel.

The evidence at trial showed that none of the items taken from the Tancos residence during the burglary was found in Williams's possession. However, the Mauser .380 semiautomatic pistol that Williams used in the New York shoot-out was the same gun that fired the bullet which killed Bunchek. Williams had bought this gun in Mechanicsville, Virginia, in 1980. Also, a footprint on the door of the Tancos house matched the tread marks of a type of athletic shoe that Williams had owned when he was in Scottsdale. In addition, Mrs. Tautkus identified Williams as the person she saw on March 12, although Wood and Koranda both testified that Williams was not the man they had seen in the neighborhood.

After Williams was shot and apprehended in New York, a nurse asked the FBI agent accompanying Williams to the hospital what Williams had done. The agent indicated that "he killed a bunch of people down south." When Williams mumbled "no, no, no," and the agent said "What about the old man in Scottsdale," Williams replied either "If [I] hadn't been framed in the first place, it never would have happened," or "None of this would have happened if I hadn't been framed in the first place." Williams's reference to being framed was to a prior murder conviction in West Virginia.[1]

---

[1]Williams claims that an informant falsely testified that Williams confessed to a 1975 murder for which he was given a life sentence. Williams escaped from the prison where he was serving that sentence. A guard was killed during that escape, for which Williams was convicted of felony murder.

Williams subsequently also admitted to burglarizing the home of Marjorie Larson in Virginia in December 1980. Like the door to the Tancos residence, the Larson front door was opened by bodily force. Both were daytime burglaries during which small items were stolen. As Williams was leaving the Larson house, he saw Larson standing in a neighbor's driveway and shot at (but did not hit) her. The gun used to fire at Larson was the same gun that was used in the Bunchek murder and that Williams used in the shoot-out with the FBI. Williams left Virginia after the Larson burglary although he was engaged to be married at the time.

Williams testified on his own behalf. His defense was that McClaskey and McClaskey's friend, "Bobby," had borrowed his gun and committed the crime. However, LeDuc and Walsh testified that McClaskey looked and dressed differently from the man seen in the neighborhood that day. Neither knew of any friend of McClaskey whose name was "Bobby." Williams also testified that he left Scottsdale to avoid being investigated for escaping from jail in 1979, committing the burglary in Virginia, and having no identification. Williams admitted that he lied under oath (at the extradition hearing) about aliases he had used, people he knew, and his presence in Arizona at the time Bunchek was killed.

The jury returned a guilty verdict on the first degree murder and burglary counts on February 10, 1984. The trial court denied Williams's motion for a new trial. In keeping with practice at the time, the sentencing phase was tried to the court pursuant to A.R.S. § 13-703 (Supp. 1986). At Williams's request, the court ordered two independent psychological evaluations. Both mental health experts concluded that he had no psychotic condition. Also at Williams's request, his advisory counsel was appointed as counsel for purposes of the sentencing phase on April 11, 1984. Williams presented numerous witnesses and letters in mitigation to show that he was subjected to a difficult childhood, that he is a religious person, that he had been a good parolee, that he had been

helpful to other inmates while incarcerated, and that the circumstances surrounding his prior convictions warrant mitigation, including the fact that a key witness in the first murder recanted and that his second conviction was based only on his participation in a prison escape rather than in the actual killing. The trial court considered evidence bearing on nineteen allegedly mitigating factors during the six-day proceeding, and concluded that they were insufficient to mitigate Williams's life of crime. On April 23, 1984 the court found no mitigating circumstances and found aggravating that Williams had two prior convictions for which life imprisonment could be imposed, and that Williams murdered Bunchek for pecuniary gain. *Id.* § 13-703(F)(1), (5). It therefore sentenced Williams to death. *Id.* § 13-703(E). The Arizona Supreme Court agreed with the trial court's finding that the allegedly mitigating circumstances were insufficient to warrant leniency.

Extensive post-sentencing proceedings occurred. The state supreme court affirmed the conviction and sentence on direct appeal, and denied several motions for reconsideration. In January 1992, Williams filed a preliminary state petition for post-conviction relief, subsequently supplemented with additional claims. The trial court dismissed the petition on January 26, 1994, and the Arizona Supreme Court denied review on April 25, 1995. The supreme court issued a death warrant scheduling the execution for September 1995. Williams filed a federal petition for writ of habeas corpus on August 15, 1995, later amended to raise thirty-five claims for relief. The district court determined that several of the claims were procedurally barred, and denied the remaining claims on the merits in an exhaustive memorandum of decision and order filed January 5, 2001.

Williams sought, and received, a Certificate of Appealability on twenty claims.[2]

---

[2]The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) does not apply to the merits of Williams's appeal because his federal peti-

## II

Williams first argues that Elizabeth Tautkus's testimony identifying Williams as the person she saw the day of the crime was the result of an unconstitutionally suggestive pretrial identification procedure. He submits that the error of admitting it cannot be harmless, as the district court held, where eyewitness testimony such as Mrs. Tautkus's is the only evidence placing a defendant at the scene of the crime.

Williams contacted the Tautkuses (who had been unable to identify him in a photographic array) to obtain a statement from them, as he had from Wood and Koranda, that Williams was not the person they saw. The Tautkuses were not cooperative, so Williams subpoenaed them for a deposition on August 28, 1983. Although Williams's advisory counsel, Richard Mesh, was present, Williams took the deposition himself. The court denied his request to be relieved of manacles and prison attire. Mrs. Tautkus found his appearance "a little disturbing," but testified at trial that it did not influence her identification. The Tautkuses and Mesh got into something of a shouting match before the deposition began, causing the prosecutor to intervene. He told the witnesses that they were there to help determine the accuracy of the information in the police report and to see if they could identify Williams as being the fellow they had seen on the day that Bunchek had been shot; he added that he did not know personally whether

tion was filed before AEDPA's effective date, *Lindh v. Murphy*, 521 U.S. 320, 327 (1997), but it does apply to the procedures for seeking review.

We review *de novo* a district court's denial of a habeas petition filed under 28 U.S.C. § 2254. *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003). A district court's factual findings are reviewed for clear error. *Alcala v. Woodford*, 334 F.3d 862, 868 (9th Cir. 2003). In pre-AEDPA cases such as this, we review legal questions and mixed questions of law and fact *de novo*. *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001) (en banc). State court findings of fact are presumed correct to the extent they are "fairly supported by the record." 28 U.S.C. § 2254(d) (1994); *Mayfield*, 270 F.3d at 922.

Williams had done the shooting and that he wanted the Tautkuses to testify truthfully to what they knew. Once the deposition began, Williams pressed Mrs. Tautkus to state whether he was the person she saw walking on Malcomb Drive on March 12. She responded affirmatively when Williams took his glasses off.

**[1]** The Arizona Supreme Court recognized that Mrs. Tautkus's identification of Williams was under "extremely suggestive circumstances," but concluded that it did not offend due process because it was Williams who procured the identification under suggestive circumstances. 166 Ariz. at 137. We agree. Although the state had not indicated that it would call the Tautkuses, Williams compelled Mrs. Tautkus to attend a deposition where it was obvious that he was the only suspect. He chose to conduct the deposition himself rather than have advisory counsel do so. While the manacles and prison garb were involuntary, they were reasonable in light of security concerns and added only marginally to the suggestiveness created by Williams's voluntary presence and self-identification as the defendant. Overall, we cannot say that the confrontation was so "impermissibly or unduly suggestive under the totality of the circumstances" that Williams was denied due process. *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (holding that the defendant's voluntary presence at a suppression hearing where identification was made was suggestive, but not the sort of "unnecessary" or "impermissible" suggestion that violates due process); *see Neil v. Biggers*, 409 U.S. 188, 196 (1972); *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).

In any event, as the district court found, even if the trial court did violate Williams's due process rights by admitting the pretrial identification, the error was harmless. Mrs. Tautkus's testimony did not have substantial and injurious effect or influence in determining the verdict under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Cross-examination brought out the weakness of her identification, the suggestive-

ness of the circumstances under which it was made, the few seconds she had to see the suspect to begin with, the fact that she had been unable to pick Williams out of the photo array, and the two and a half years that had elapsed between her five second encounter on March 12 and the deposition at which she identified Williams. In addition, two other witnesses with a better opportunity than Mrs. Tautkus to see the suspect testified that Williams was not the person they saw in the neighborhood. Finally, strong circumstantial evidence connected Williams to the scene — he rented a house a few minutes away and a shoe print matching a pair of shoes he owned was found on the Tancoses' front door — and to the murder, given that his gun killed John Bunchek and that Williams fled immediately thereafter.

Williams's alternative request for an evidentiary hearing is unsupported and fails as well.

## III

Williams faults admission of the statement he made in response to the FBI agent's question about the old man in Scottsdale. Williams was read his *Miranda* rights just after he was shot. *Miranda v. Arizona*, 384 U.S. 436 (1966). Either in the ambulance or at the hospital, a nurse asked an FBI agent "what did this guy do." The agent responded that "he killed a bunch of people down south." Williams mumbled "no, no, no." The agent then asked, "What about the guy, the old man down south?" (or "the old man in Scottsdale"). Williams then said: "If I hadn't been framed, that wouldn't have happened in the first place," or "None of this would have happened if I hadn't been framed in the first place." After a voluntariness hearing, the trial court credited the agent's testimony about timing and determined that Williams's statement was knowingly, intelligently, and voluntarily made after he was advised of his *Miranda* rights and before he said that he wanted a lawyer. The prosecution did not introduce the statement in its case-in-chief, but Williams did. He now argues that his

silence in the interim between being administered the *Miranda* warning, and making the statement, indicates that he invoked his rights and didn't waive them.[3]

**[2]** The district court agreed with the trial court's findings that Williams interjected himself into the conversation between the nurse and FBI agent, that this interjection led to the agent's question, and that Williams voluntarily answered it. So do we. *See United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (implying waiver where a defendant did not invoke his rights, then initiated a conversation, and later did invoke his rights). Regardless, Williams's statement would have been admissible for the purpose the prosecution sought to use it — to impeach Williams when he took the stand. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). Accordingly, Williams is not entitled to habeas relief on this account.

## IV

Williams complains that the "other acts" evidence admitted by the trial court was impermissible character evidence that was prejudicial. It consisted of testimony concerning the Larson burglary that Williams committed in Virginia on December 2, 1980; the shoot-out between Williams and the FBI in New York; Williams's use of an alias, James Byrd, to buy the Mauser .380 caliber automatic on October 16, 1980, to obtain a Virginia driver's license in that name, and to procure insurance policies; and Williams's opulent lifestyle, without apparent means of support, when he was engaged to Diane Bowery. "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision," *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), and Williams has failed to carry it.

---

[3]The only certified issue is whether Williams waived his *Miranda* rights.

**[3]** The opulent lifestyle testimony presents no due process problem because the trial court sustained Williams's objection and admonished the jury to disregard it. *See United States v. McCormac*, 309 F.3d 623, 626 (9th Cir. 2002) (noting that "juries are presumed to heed cautionary instructions"). Nor does the evidence that Williams used a false name implicate due process because it was necessary to tie Williams to the gun that killed Bunchek; this could not be done if the person named on the driver's license used to purchase the gun had really been Byrd instead of Williams. *See Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (observing that admission of "other acts" evidence will violate due process only when there are no permissible inferences the jury may draw from it). Williams also conceded that he lied under oath and used different aliases while in Scottsdale, so evidence of another alias cannot have been unduly prejudicial.

**[4]** Evidence of the Larson burglary bears on the identity of Bunchek's killer. That the same gun belonging to Williams was used to shoot at Larson and to kill Bunchek is a signature element that links Williams to both burglaries. *See, e.g.*, *United States v. Higgs*, 353 F.3d 281, 311-12 (4th Cir. 2003) (holding that evidence of a nightclub shooting two months prior to a murder was admissible identity evidence where the caliber of the bullets fired at the nightclub was the same as the caliber of the bullets fired in the murder). There are other similarities as well: Both were daytime burglaries, in both the doors were knocked open by bodily force, in both only small items were taken, and in both the burglar directed a gunshot at a witness. Williams left town immediately after both burglaries. *See, e.g., United States v. Quinn*, 18 F.3d 1461, 1466 (9th Cir. 1994) (finding sufficient distinctiveness where two bank robberies occurred close together in time and location, were "takeover" robberies, and were committed by a person of similar size and dress brandishing a similar weapon). The jury was instructed not to consider evidence of other crimes or acts as proof of the character of the defendant in order to show that he acted in conformity therewith, but to consider it

only as evidence of proof of intent or identity. This properly limited the jury's consideration of the "other acts" and obviates Williams's concern that his "other acts" were impermissible character evidence.

**[5]** Finally, evidence about the shoot-out was probative of Williams's identity as Bunchek's killer because he still had (and used) the Mauser .380 after the Bunchek murder. The events surrounding Williams's arrest also provided relevant context for the statement that he made in route to, or at, the hospital. Williams argues that he should have been allowed to stipulate to possession of the gun, but due process does not require as much. *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997) (holding that "the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, . . . a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.").

Williams's alternative request for an evidentiary hearing is unsupported and no basis appears for granting it.

V

Williams asserts that the prosecutor engaged in misconduct by submitting false evidence to the grand jury; tainting the Tautkus identification testimony by telling her that she was only there to identify Williams as the person she saw in her neighborhood; and concealing the location of McClaskey, who was a critical defense witness. Williams refers to other incidents as well, including abusive language and tampering with evidence, that the district court properly found had not been fairly presented to the Arizona Supreme Court. *See Rose v. Lundy*, 455 U.S. 509, 510 (1982) (requiring exhaustion); *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (explaining that to exhaust, a petitioner must "fairly present" claims to the state's highest court). The only allusion to these incidents came in Williams's supplemental motion for reconsideration

of the supreme court's decision affirming his conviction and sentence, and even so, only in the form of a record citation for one of the incidents in connection with claims of ineffective assistance of counsel. This is insufficient to present the issue fairly and to preserve it for habeas review. *Rose v. Palmateer*, 395 F.3d 1108, 1110-11 (9th Cir. 2005) (holding that a petitioner does not fairly present a Fifth Amendment claim to the state courts when it is merely discussed as one of several issues handled ineffectively by counsel).

Williams's suborning perjury argument turns on an exchange between the prosecutor and Detective Bingham.[4] In

---

[4]The colloquy was:

Q   Did your department make any investigation at the residence of Randy Cooper to recover any items or any types of evidence?

A   Yes. We recovered, through a search warrant, several items from the room that he occupied. We also recovered, from Mr. McClaski, in the garbage can, a shoe box which contained some silverware, some other items. And the shoe box was an NCC Tiger shoe box.

Q   Did you, during the course of your investigation, attempt to identify to some extent the type of shoe that made the imprint on the door?

A   Yes, I did.

Q   And what type of shoe made that imprint?

A   An NCC Tiger running shoe.

Q   Did you determine whether or not the subject at that point wore or used the NCC Tiger running shoe?

A   Yes. Those — that particular pair of shoes were purchased by Mr. McClaski for a person that he called Randy Cooper.

Q   Were there any fingerprints that came from that residence?

A   Yes.

Q   And had they been identified?

A   Yes, they have.

Williams's view, Bingham falsely testified that Williams's fingerprints had been found at the crime scene and that the footprint on the door of the Tancos residence matched his shoes. The district court found that Bingham did not testify falsely, and we agree. While the prosecutor's query about "that residence" could have been clearer, in context it is clear enough that the line of questioning had to do with Randy Cooper's residence. The point was that Williams was "Randy Cooper," and thus that the NCC Tiger shoe box was Williams's, not "Cooper's," because Williams's fingerprints showed that it was he, not someone named Cooper, who lived at the residence. Nor was Bingham's testimony about the shoe print false, as it simply conveys the detective's conclusion that the type of shoe that made the imprint on the Tancos door was an NCC Tiger running shoe, and that this was the type of shoe that McClaskey bought for "Randy Cooper." Bingham did not testify, as Williams suggests, that Williams made the footprint. Regardless, any constitutional error in the grand jury proceedings is harmless because Williams was ultimately convicted of the offenses charged. *United States v. Mechanik*, 475 U.S. 66, 70 (1986).

[6] During the "shouting match" that occurred after Mrs. Tautkus arrived for her deposition, the prosecutor tried to calm things down and in the process, remarked that "all we were trying to do . . . was to determine the accuracy of the information that was in the police report and whether or not

---

Q  By whom?

A  By the F.B.I.

Q  And what name have they been attached?

A  Ronald Turney Williams.

Q  And has Mr. Cooper been identified through fingerprints and other means as a Ronald Turney Williams?

A  Yes, he has.

they could identify [Williams] as being the fellow who they had seen in the neighborhood on the day that Mr. Bunchek had been shot." He added that he did not personally know whether Williams was the person who did the shooting and that Mrs. Tautkus should not prejudge the question. In the circumstances, we cannot see how this amounted to coaching that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeCristoforo*, 416 U.S. 637, 643 (1974) (articulating standard for prosecutorial misconduct).

The Arizona Supreme Court found that the prosecutor tracked McClaskey down in Sonora, Texas, had a telephone number for one of his neighbors, and turned this information over to defense investigators before April 1983. Defense investigators were able to contact the neighbor but apparently not McClaskey. McClaskey told state investigators in this time frame that he was going to California for surgery, and evidently left Texas in May. The state did not immediately disclose this to Williams, but did so at some point. The supreme court found that Williams knew as much about McClaskey's whereabouts as the state, which "did not fail to disclose relevant information to the defense." 166 Ariz. at 142. This finding is entitled to a presumption of correctness that Williams has not overcome. At most the evidence Williams relies upon shows that the state had kept in touch with McClaskey when he was in Texas; there is no indication that Williams made any effort to find out where McClaskey was after his investigators were told that McClaskey was in Sonora, or that the prosecution somehow "concealed" him.

Williams's offers no reason why he should have an evidentiary hearing on this issue, and we decline his request for remand.

## VI

Williams also claims judicial misconduct on account of the trial judge's display of bias and hostility. Williams cites the

judge's requiring him to stay near counsel table during the trial and threatening that he would be shot if he strayed; requiring Williams to obtain permission from the guards before getting a drink of water; and advising the guards to be wary. The district court held that only the allegation of bias because of the order to stay near counsel table was exhausted. As to that claim, the court found that the trial judge went out of his way to treat both parties evenhandedly, and that his determination that Williams should stay near the counsel table was based on legitimate security concerns. We agree.

**[7]** The trial judge ordered *both* Williams *and* the prosecutor to remain at counsel table during trial so that it would not appear that either side was being treated differently. Requiring Williams to stay put was an entirely sensible precaution given Williams's history of escaping from custody and of violent encounters with law enforcement agents. He had been charged by the West Virginia State Penitentiary with one attempted escape from that facility, and later Williams in fact escaped with fourteen other prisoners during the course of which a police officer was killed. Williams was convicted of first-degree felony murder for that episode. He also escaped from the Peterson Place Hospital in West Virginia. And Williams had engaged in several outbursts, including physical confrontations with deputies, during pretrial hearings. In these circumstances, reasonable security measures, as well as warnings about non-compliance, were at once prudent and not indicative of bias. *See Liteky v. United States*, 510 U.S. 540, 556 (1994) (noting that "[a] judge's ordinary efforts at courtroom administration — even a stern and short-tempered judge's ordinary efforts at courtroom administration — remain immune [from charges of bias]"). None of the judge's comments to which Williams now objects was made in the presence of the jury. Further, the facts in this case are completely different from those in *Walker v. Lockhart*, 763 F.2d 942 (8th Cir. 1985), upon which Williams relies. There, the judge instructed a deputy who was to escort the defendant to church that if the defendant "made a move to shoot him down,

because he [the judge] didn't want him brought back to him because he intended to burn the S.O.B. anyway." *Id.* at 946. The judge here did not come close to displaying this kind of raw judicial bias.

Williams concedes that he did not raise additional facts showing bias or hostility in state court, but contends that additional instances should not be procedurally defaulted because they supplement, rather than change, the basic claim that judicial bias permeated the proceedings. However, he fails to point to any conduct that arguably reveals an opinion derived from an extrajudicial source, or "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555. Accordingly, even if claims other than the requirement to stay at counsel's table were exhausted, they are of the same order of magnitude and are thus subsumed within the conclusion that Williams's right to trial before an impartial judge was not offended.

## VII

Williams maintains that the voir dire procedures used to select jurors were unconstitutionally restrictive in scope and substance for a number of reasons. The trial court conducted voir dire, and we are not persuaded that it did so in a manner that deprived Williams of an impartial jury. *See Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (recognizing that state courts are afforded wide latitude in how they conduct voir dire); *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (requiring voir dire to be adequate enough to identify unqualified jurors).

In sum: The court's failure to ask more than one follow-up question of a prospective juror who had heard about the case and remembered what she heard cannot have prejudiced Williams because the only facts that the juror remembered were that Mrs. Bunchek was home and Mr. Bunchek went next door. Nor does Williams suggest how he could be prejudiced by the court's asking only one member of the venire, rather

than all of them, whether he or she would only consider the defendant's guilt or innocence and not his possible punishment; if anything, the question cuts against, rather than in favor of, the defense. Williams claims that the court should have excused one juror for cause who stated that she may have been biased toward Williams because she was once burglarized, but Williams did not make a cause challenge, and the juror ultimately was not seated. The same applies to another prospective juror whose father had been shot by his brother; the judge asked whether this would carry over into the trial and the juror responded negatively. Williams did not request follow-up before passing the panel for cause, and he used a peremptory challenge to remove this venireman. Likewise, Williams did not challenge a prospective juror who had a good friend who was an FBI or customs agent but said that she would not treat FBI agents' testimony differently as a result of this relationship. The trial judge also inquired whether prospective jurors could set aside sympathy for the victim's wife if she testified, despite the fact that she was deceased, but Williams does not explain how this was harmful given that people may, or may not, testify for any number of reasons. Finally, Williams did not try to show the trial court (or us) how refusing to provide the venire with his questionnaire made any difference. As his advisory counsel acknowledged, most of its 150-200 form questions were duplicative of the court's voir dire, and Williams did not request specific, further questions of particular jurors before accepting the panel.

## VIII

Prior to trial, Williams asked the trial court for funds to secure the attendance of various out-of-state witnesses. After a hearing, the court determined that a number of them were not material. Williams correctly notes that he had a right to submit relevant testimony, *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), and to compel the attendance of witnesses in his defense, *Washington v. Texas*, 388 U.S. 14, 18 (1967);

A.R.S. § 13-4093, but he has not made a plausible showing of how the testimony of absent witnesses would have been material and favorable to his defense. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (adopting this requirement for purposes of the compulsory process clause); A.R.S. § 13-4093 (making funds available for material witnesses). Williams now claims that Frank Passarella, Dr. DeRossi, Leonard Joy, Luther Cook and Jerry Likens were material because they would have testified to the circumstances surrounding the inculpatory statement that he made to the FBI, and that Bill Mason would have made a difference by helping to show that McClaskey was the killer. The district court agreed with the trial court on the lack of materiality, as do we.

Passarella was Williams's former attorney whom he proffered to testify that FBI agents questioned him before contacting counsel. Testimony to this effect would not have been relevant, however, as the trial court found that Williams did not request a lawyer prior to making the statement. As we have explained, that finding is presumptively correct.

Dr. DeRossi was the Chief Surgeon in charge of the trauma team that treated Williams following his arrest by the FBI, but Williams's investigator testified that DeRossi did not himself treat Williams or know anything about his condition or operation except for information reflected in hospital records. Others who did observe Williams at the time of his statement and were knowledgeable about his treatment did testify, so Williams could not have been prejudiced by DeRossi's absence.

Joy was an Assistant Public Defender who represented Williams during his arraignment at the hospital. According to Williams, Joy would have testified that FBI agents were bothering Williams, that Williams told the FBI "to quit," and that he had tubes down his throat, IVs in his arm, stitches four or five places, and was in shock. However, the trial court found that Joy did not see Williams until 5:00 p.m. As he was not percipient to Williams's condition when the inculpatory state-

ment was made around 2:30 p.m, Joy's only knowledge would have come from Williams and was hearsay. There also was no evidence that Joy would have testified to Williams's condition. Assuming that he would have, however, anything Joy observed about the shape that Williams was in after surgery has little bearing on his condition when he made the statement.

Cook was a West Virginia police officer to whom Likens admitted that he lied when he testified at Williams's 1975 homicide trial that Williams had admitted killing the victim. Williams proffered both witnesses to show that his statement — "None of this would have happened if I hadn't been framed in the first place" — was not a confession but related instead to the 1975 West Virginia murder conviction for which Williams claims he was framed. At most, these witnesses could have explained how Williams was framed; they could not have explained what Williams meant by what he said. What his statement meant was the only consequential issue. Whether Williams was framed sheds no light on whether Williams meant by "none of this would have happened" that he would not have been incarcerated, wouldn't have escaped, wouldn't have been in Scottsdale, and wouldn't have been living with McClasky such that McClasky could take Williams's gun and use it with Bobby to commit the burglary and kill Bunchek — as he posits — or whether he meant that he wouldn't have been arrested in New York City after precipitately leaving Scottsdale after burgling the Tancos residence and shooting Bunchek. Nor would the testimony of Cook or Likens have related to the circumstances surrounding what Williams told the FBI. Therefore, their proffered testimony was neither relevant nor material.

Lastly, Mason was a Texas prosecutor who would have testified that there was an outstanding arrest warrant for McClaskey for stealing a trailer. However, the fact that McClaskey may have stolen a trailer does not make it more likely that he, instead of Williams, killed Bunchek.

No basis appears for remanding for an evidentiary hearing, as Williams alternatively requests.

IX

**[8]** Williams contends that he was denied competent assistance of counsel when his appointed counsel failed to challenge false grand jury testimony and to provide the time, money, and assistance needed to represent him. As a result, Williams asserts that he was forced to undertake his own representation. We have already explained that there was no false grand jury testimony, so by definition counsel was not deficient and Williams was not prejudiced by any failure to object to Detective Bingham's testimony. In any event, this could not have influenced Williams's decision to proceed *pro se* because it wasn't known at the time. Apart from this, a thorough review of the record leaves no doubt that Williams's decision to invoke his *Faretta* rights and to represent himself was knowing, intelligent, unequivocal and voluntary. *Faretta v. California*, 422 U.S. 806, 834 (1975).

Williams was arraigned on April 3, 1983. Deputy Public Defender Dennis Freeman was appointed to represent him. On April 4, Freeman filed a motion for Williams requesting that Williams be allowed to proceed *pro se*. At the hearing, Williams had no particular reason for wanting to have Freeman taken off the case, but explained that prison conditions prevented him from being able to interact meaningfully with Freeman or any other attorney. The trial court determined that the conditions of Williams's confinement did not unreasonably interfere with his ability to consult with counsel. Williams renewed his motion on April 18, 1983. He told the court that he and Freeman had reached an impasse in their relationship, that Freeman had never tried a capital case, and that Freeman had said he was overloaded and that the public defender's office was short attorneys, investigators and secretaries. In these circumstances Williams was of the opinion that the Maricopa County Public Defender's Office could not

give him adequate representation. Before the court could rule, Richard Mesh, an experienced public defender, stepped in to replace Freeman. In turn, Mesh was relieved a week later, on April 25, 1983, when Williams asked the court to reconsider his request to proceed *pro se*. At the hearing, Williams stated that he had given the matter a good deal of consideration. Factors he mentioned were the budget problems of the Public Defender's Office, the charges and the sentences, the physical conditions at the jail, and "a number of other things." Williams expressed no displeasure with Mesh and offered to work with him in the capacity of advisory counsel. He indicated to the court that he had represented himself in two previous cases, one of which went to trial. The trial court engaged in an extensive colloquy during which Williams demonstrated that he had "picked up quite a bit in [his] courtroom experiences," indicated that he understood the nature of the charges and the sentences that he faced as well as the pitfalls of representing himself and the ground rules by which trial would be conducted, and averred that he wanted "to handle this case personally, manage and conduct this defense on [his] own." After receiving Williams's written waiver of counsel, and finding that Williams knowingly, intelligently and voluntarily gave up his right to counsel, the court acceded to Williams's request to represent himself but appointed Mesh as advisory counsel.[5] Williams represented himself throughout the guilt phase with Mesh as advisory counsel until Mesh was hospitalized; when it became obvious that Mesh could not continue, he was replaced as advisory counsel by another public defender, Robert S. Briney, who was familiar with the case.

All arguments that Williams now makes about counsel's ineffective performance have to do with Mesh's assistance *after* Williams invoked his *Faretta* rights and Mesh became advisory counsel. For example, Williams maintains that Mesh

---

[5]The court asked Williams again on June 14, 1983, whether he still wanted to represent himself, and he said that he did.

was not able to devote more than eight hours a week to his case, was too overburdened to make phone calls, told him that the work was more than he had ever encountered, did not promptly process the motions that Williams wanted him to type, refused to type a list of voir dire questions, and failed to prepare some diagrams. These alleged deficiencies were brought to the trial court's attention in connection with Williams's request for the appointment of additional *advisory* counsel. Even so, Williams acknowledged, "There's no problem with Mr. Mesh. He's done — as far as I'm concerned, he's doing a terrific job with the amount of time that he has available." The trial court observed that Mesh was one of Arizona's most able lawyers, and the district court found no indication that Mesh was not conducting Williams's defense in a capable manner or that there was irreconcilable conflict.

It is well settled that we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Williams does not show any respect in which Mesh's performance was unprofessional during the week that he served as counsel before Williams chose to represent himself, nor any respect in which their relationship was conflicted. His waiver could not, therefore, have been influenced, let alone coerced, by ineffective assistance of counsel. *See Crandell v. Bunnell*, 144 F.3d 1213, 1216 (9th Cir. 1998), *overruled in part on other grounds, Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (stating the rule that a defendant cannot be forced to choose between an incompetent counsel and no counsel, or to proceed when he has an irreconcilable conflict with appointed counsel).[6]

---

[6]Williams makes no free-standing claim ineffectiveness assistance of counsel, nor could he. Having failed to show that his decision to represent himself was involuntary, Williams cannot claim that he was denied the effective assistance of counsel at trial. *See Faretta*, 422 U.S. at 834, n.46 (stating that "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel'").

## X

Williams maintains that he was denied expert mental health assistance that was needed to prepare a defense. Prior to trial, he filed two motions seeking the appointment of a psychiatrist. *See* Rule 11, Ariz.R.Crim.P., 17 A.R.S. In his Motion for Psychiatric Examination of Incarcerated Defendant filed on July 15, 1983, Williams requested a psychiatric examination to determine whether he was "mentally liable and responsible on March 12, 1981." The motion was unsupported and the trial court denied it because Williams had failed to produce any evidence of a mental problem. The court also noted that Williams was not advancing an insanity defense at that time.

On October 20, 1983 Williams filed a motion to Have Defendant's Mental Condition Examined that sought appointment of two mental health experts to determine whether he suffered from a mental disease or defect on March 12, 1981, or currently. This motion was supported by reports of court-ordered psychiatric examinations in 1964 and 1970. There were three 1964 reports. The first diagnosed him as having "sociopathic personality disturbance, anti-social reaction." The second offered a tentative diagnosis of "psychoneurotic disorder, depressive reaction" and "schizophrenic reaction, catatonic type." The third 1964 report found that testing bore out a diagnosis of "chronic undifferentiated schizophrenia" that was "incipient, but progressing." The 1970 report diagnosed Williams as having "antisocial personality." Hallucinations were denied. The reports indicated that Williams was bright intellectually with a high IQ, and Williams advised the court that he had no treatment since these examinations. At the hearing, advisory counsel indicated that Williams does "wave in, wave out"; that when things were going well for Williams he was a joy to have as a client but when things were not going well, he was as difficult a client as any; and that Williams wanted to bring to the court's attention "that, for all he knows, he may have been under some kind of psychiatric disorder at the time of his alleged involvement with

Mr. Bunchek that might be of a defensive nature to him that he's not the proper person to evaluate it." The trial court denied the motion as it found nothing in the reports to show that Williams was incompetent or insane.

The Arizona Supreme Court agreed with the trial court's findings.[7] It concluded that neither Arizona Rule 11, nor the due process clause, nor *Ake v. Oklahoma*, 470 U.S. 68 (1985), supported Williams's position that a psychiatrist must be appointed whenever a criminal defendant states that he is contemplating an insanity defense. Rather, the court held that some threshold showing that the appointment is reasonably necessary is required, and Williams had made none.

The district court found that Williams failed to establish that his sanity was likely to be a significant factor in his defense. It also emphasized that the defense Williams advanced at trial was that McClaskey and Bobby had committed the burglary and murder.

[9] *Ake*, which was decided after Williams was convicted but before the Arizona Supreme Court resolved his direct appeal, held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to

---

[7]As the court explained:

> The nature of the crime, Williams's conduct at trial, and prior psychiatric examinations all suggest that Williams was sane at the time of the offense and competent to stand trial. Although Bunchek's death was tragic and vicious, it did not occur under unusual circumstances or in an unusual way; nothing about the killing suggests that the murderer was insane. It is similarly impossible to draw any inference of mental instability from Williams's conduct at trial. Williams insisted on his right to represent himself and in doing so he demonstrated remarkable ability. Finally, Williams's prior psychiatric examinations suggest only that he is prone to engage in antisocial conduct. His subsequent record indicates that this diagnosis was optimistic.

166 Ariz. at 139.

be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." 470 U.S. at 74, 83. Of course, Williams cannot be expected to have foreseen and thus to have made the showing contemplated by *Ake*,[8] but nothing in the record suggests that Williams's mental health *could* have been a substantial factor in his defense at trial. Unlike for Ake, insanity was not Williams's sole defense: Williams's behavior was not bizarre, and psychiatrists who examined Williams after the guilt phase did not find that he was incompetent, delusional, or psychotic. *Id.* at 86 (explaining by reference to these points why it was clear from the record that Ake's mental state at the time of the offense was a substantial factor in his defense). In these circumstances we cannot say that psychiatric assistance would have been of probable value. *Id.* at 82; *cf. Gretzler v. Stewart*, 112 F.3d 992, 1000 (9th Cir. 1997) (noting that even if *Ake* applied, providing further assistance was not constitutionally required given testimony of two psychiatrists that the defendant's sanity was not an issue). Williams's mental condition was simply not "seriously in question." *Ake*, 470 U.S. at 70. Accordingly, his due process rights were not violated.

Williams asks for a remand for an evidentiary hearing, but suggests no basis upon which an evidentiary hearing should be granted.

## XI

**[10]** Finally with respect to the guilt phase, Williams contends that the evidence was insufficient to support a conviction. The district court found otherwise based on evidence showing that: Williams possessed the gun that was used to kill

---

[8]Under Rules 11.2 and 11.3, Williams had to show that "reasonable grounds for an examination exist." Under Arizona law, evidence sufficed for an examination if it created a doubt in the court's mind about competency or sanity. *Williams*, 166 Ariz. at 139

Bunchek before and after the murder; the shoe print found on the door to the Tancos residence was consistent with a pair of shoes worn by Williams; his roommates identified the suspect in a composite sketch as Williams; Williams left Scottsdale the day of the murder; Williams appeared to confess to Bunchek's murder; the burglary Williams committed in Annandale, Virginia further indicated that Williams was the Tancos burglar; and the jury could reasonably disbelieve Williams as he admitted that he lied under oath. Williams's quarrel with the district court's analysis is essentially with the weight of this evidence, but our review of the record also leaves us satisfied that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

## XII

We turn to the issues raised by Williams concerning his sentencing phase. The state trial court imposed the death penalty after it concluded that there were no mitigating circumstances and that there were two aggravating circumstances: that Williams had two prior convictions for which life in prison could be imposed and that the murder of Bunchek was for pecuniary gain.

Williams presents several challenges relating to the preparation of two psychological evaluations and the presentence report. As to the psychological evaluations, Williams argues that he was denied an independent psychological evaluation in violation of *Ake*, and that he was not given a *Miranda* warning before meeting with two court-appointed mental health experts. As to the presentence report, Williams argues that he was not given a *Miranda* warning prior to meeting with the probation officer. We address these contentions in turn.

**[11]** Where the mental health of an accused person is genuinely in issue, due process requires the opportunity to have an

independent mental health expert to assist the defense. *Ake v. Oklahoma*, 470 U.S. 68, 74 (1985). In *Smith v. McCormick*, 914 F.2d 1153 (9th Cir. 1990), we held that the *Ake* right to an independent mental health expert applies not just at trial, but also at the sentencing phase. *Id.* at 1157. However, for an independent mental health expert to be constitutionally required, the defendant must place his or her mental state at issue. *See id.* We considered in Part X of this opinion, and rejected, Petitioner's *Ake* claim in the guilt phase proceedings, because Williams did not make a threshold showing that his mental state was in question. At the sentencing phase, Williams introduced no evidence, apart from the evidence previously introduced during the guilt phase, that suggested his mental state was at issue. Because Williams's *Ake* claim regarding sentencing rests upon the same evidence as his claim regarding guilt, and because we held that same evidence was insufficient to establish a threshold showing that his mental state would be at issue, we now hold also that he did not make a threshold showing that his mental state would be at issue during sentencing. Further, our additional review of the record leads us to conclude that Williams's mental health could not have been a substantial factor during the sentencing phase. *Vickers v. Stewart*, 144 F.3d 613, 615 (9th Cir. 1998). In sum, we conclude that Williams did not show that he placed his mental health sufficiently at issue at sentencing to require an independent mental health expert.

We next address Williams's contention that constitutional error occurred when he was not given *Miranda* warnings before being examined by two court appointed mental health experts. When Petitioner requested separate funds for a psychological evaluation, the trial court informed Williams of Rule 26.5, which provides:

> At any time before sentence is pronounced, the court may order the defendant to undergo mental health examination or diagnostic evaluation. Reports under

> this section shall be due at the same time as the pre-
> sentence report unless the court orders otherwise.

Rule 26.5, Ariz.Rule.Crim.P., 17 A.R.S. The trial court said that it would order a psychological evaluation under Rule 26.5, if that was what Williams was requesting. Williams initially replied that he was not requesting an examination under Rule 26.5 but, after conferring with advisory counsel, Williams accepted the trial court's offer of an examination under that rule. The trial court then ordered two evaluations, one by an expert that Williams recommended and one by an expert the state chose. The trial court also ordered that the reports by the two doctors be submitted to Williams, to the state, and to the court.

[12] Both experts interviewed Williams, and thereafter submitted their reports as instructed by the trial court. It is established that Williams was not given a *Miranda* warning before either interview, and Williams claims this was reversible error under *Estelle v. Smith*, 451 U.S. 454 (1981). In *Smith*, the Court held that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.* at 468. The Court clarified the scope of *Smith* in *Buchanan v. Kentucky*, 483 U.S. 402 (1987), holding:

> [I]f a defendant requests such an evaluation or pre-
> sents psychiatric evidence, then, at the very least, the
> prosecution may rebut this presentation with evi-
> dence from the reports of the examination that the
> defendant requested. The defendant would have no
> Fifth Amendment privilege against the introduction
> of this psychiatric testimony by the prosecution.

*Id.* at 422-23. Here, Williams requested an independent psychological evaluation, and eventually accepted the trial

court's offer of a Rule 26.5 examination. Because Williams requested a psychological evaluation, and thereafter agreed to participate in a Rule 26.5 examination, we hold that the Fifth Amendment did not require that Williams be given *Miranda* warnings before he was examined by the mental health experts.

[13] Williams also argues that he should have been given a *Miranda* warning before being interviewed by the probation officer who prepared the presentence report. We have previously held in *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001), that the Fifth Amendment privilege applies during presentence interviews. *Id*. at 538. But in *Hoffman* we held that there was no Fifth Amendment violation because Hoffman was informed of his right to remain silent prior to the presentence interview. *Id*. By contrast, Williams was not informed of a right to remain silent before his presentence interview. Accordingly, the presentence interview of Williams was conducted in violation of the Fifth Amendment.[9]

Having concluded that the presentence interview violated Williams's Fifth Amendment privilege against self incrimination, we next consider whether that was harmless error under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Pizzutto v. Arave*, 280 F.3d 949, 970 (2002) (applying harmless error analysis to a Fifth Amendment violation for using "uncounseled, non-Mirandized statements" against a capital defendant). Applying the standard of *Brecht*, we must decide whether the error "had substantial and injurious effect or

---

[9]The state argues that *Hoffman* is a new rule which, under *Teague v. Lane*, 489 U.S. 288 (1989), cannot be applied retroactively. However, we expressly rejected that argument in *Hoffman*. *See* 236 F.3d at 537-38. This panel cannot revisit precedential decisions made by other panels of this court, except in the limited case where intervening higher authority negates a prior circuit precedent. *See, e.g.*, *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). Accordingly, we reject the state's *Teague* argument.

influence" on the proceedings. 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

**[14]** We conclude that the introduction of the presentence report was harmless error. In arguing to the contrary, Williams contends that the report relied on his statements in which he had downplayed a troubled family background. He also points to statements in the report that suggest that he was callous and indifferent to the harm caused to others by his past criminal activity. However, the presentence report also stated that Williams reasserted his innocence during the presentence interview, claimed that he had never harmed anybody during his prior criminal activities, and asserted that he had previously attempted to save the life of a drowning child. Reviewing his statements given in the presentence interview as a whole, and assessing their possible impact on the trial court, we cannot conclude that the introduction of the presentence report before the sentencing judge "had substantial and injurious effect or influence" on the sentencing proceedings. The admission of the PSR was also harmless because there was no testimony in the PSR that was not presented previously by other sources.

We also conclude that there is no proper basis for Williams's request for an evidentiary hearing on these issues.

### XIII

Williams maintains that the trial court misused Williams's assertion of innocence against him when it denied his request to investigate potential mitigating evidence, and when it found that there was no possibility that Williams would be rehabilitated.

Williams first argues that the trial court held Williams's assertion of innocence against him when it denied Williams the funds necessary to investigate and present mitigating evidence. Although Williams presents this argument in broad

and extravagant terms, the only evidence in the record to which he cites in support of this claim, and the only specific claim addressed by the district court, concerns a request for genetic testing.

**[15]** Williams requested that the trial court provide defense funds to test for an XYY chromosome abnormality, which might have shown that Williams was genetically predisposed to violent behavior. Williams's claim turns on an exchange with the trial court, in which the court sought to understand how evidence of a chromosome abnormality would be mitigating.[10] Although the trial court was skeptical how Williams

---

[10]The colloquy was:

Q  I'm concerned, Mr. Williams, because you are telling me that you want this examination to show propensity for violence because of a chromosome defect, and it's you talking. You are representing yourself, and I cannot view what you do as anything but yourself. The only relevance to this would be if you are admitting that you did these things and you are now telling me that you have a chromosome abnormality. It is your position under oath that you did not do this in which case this couldn't be mitigating because if you have a violent personality it would be absolutely irrelevant since it's your claim that you did not do this at all.

A  I'm not admitting anything. The jury came in with a verdict saying I am guilty. By virtue of their verdict I am allowed to bring before this court any and all mitigating circumstances. That's the jury's verdict that you are accepting. If I say I am not guilty, can I go home?

. . .

Q  Tell me which side of your face you are talking out of. Are you saying you did this and have a violent, aggressive behavior and can prove it, and you want the state to provide funds for a doctor to prove that? Or are you saying Ronald Turney Williams, you, did not do it?

A  Whether or not I am guilty, I am asking that this court consider that fact of the chromosome deficiency as a mitigating circumstance and appoint the expert in that field to make a determination as to whether or not that is true.

could proclaim his innocence and simultaneously argue that whatever crimes he had committed were on account of a genetic abnormality, the trial court did not deny funds for the testing because Williams maintained he was innocent. Rather, Williams offered no evidence suggesting that testing was warranted, and admitted that he had "no idea" whether he had a chromosome abnormality. We conclude that the trial court did not use Williams's assertion of innocence against him in this respect.

Williams also argues that the trial court held his assertion of innocence against him when the trial court found that there was no possibility of rehabilitation. Williams does not cite to the record to support this claim, and the state argues that the trial court found that Williams could not be rehabilitated based on his long and violent criminal history. But even if the

---

Q  All right. If you say Doctor Hecht is going to testify that you have this XYY chromosome abnormality, and you are, therefore, predisposed to violent behavior, that that is a mitigating circumstance. Is that your argument?

A  I would like to be tested on it. If I am found to have it, then I may very well use it.

. . .

Q  Have you ever raised this issue in any other case?
I know you've submitted psychological reports dating back to when you were 18, I believe. None of these give any indication of a genetic difficulty at all, or any mental inadequacies.

A  I have no idea whether or not I have any chromosome defects or abnormalities either, but I would like to have this particular doctor do a check and see if I do. If I do, then, of course, I would like to use it.

Q  Well, in the absence of any clue that this is not purely fishing, I will deny this motion.
If you will recall in the Rule 11 matter I followed the same pattern. There had to be some evidence justifying your claim that you were not competent to stand trial.

trial court did consider Williams's assertion of innocence when it found that Williams could not be rehabilitated, this was not error. *See Gollaher v. United States*, 419 F.2d 520, 530 (9th Cir. 1969) ("It is almost axiomatic that the first step toward rehabilitation of an offender is the offender's recognition that he was at fault."). We hold that the state trial court in sentencing did not offend the Fifth Amendment by penalizing Williams for asserting his innocence.

## XIV

When detailing potential aggravating circumstances at the presentence hearing, the prosecutor cited the Larson burglary in Virginia and Williams's use of a gun when he was arrested in New York by the FBI. Williams argues that because he had not been convicted in connection with these incidents, the trial court should not have considered them to be aggravating circumstances. *See* A.R.S. § 13-703(E) (Supp. 1986) (enumerating specific aggravating circumstances). Williams has cited no authority, and we have found none, stating that the trial court could not consider other potential aggravating circumstances. Further, considering prior unadjudicated criminal conduct is permissible under Arizona law under some circumstances. *See State v. Rossi*, 830 P.2d 797, 800 (Ariz. 1992) ("While defendant had no felony convictions, he had been arrested for theft, forgery, drug offenses and possession of a firearm, facts that a court may legitimately consider when lack of a conviction record is advanced as a mitigating factor.").

**[16]** We need not decide whether A.R.S. § 13-703(E) provides an exhaustive list of aggravating circumstances that a court may consider. The district court found, and we agree, that the trial court did not consider the unadjudicated offenses when determining the existence of aggravating circumstances. The record indicates that the prosecution sought to characterize the prior unadjudicated acts as aggravating circumstances, but not that the trial court considered them to be aggravating

circumstances. Here, the trial court stated that it found only two aggravating factors: that Williams was convicted of two prior offenses for which life imprisonment could have been a penalty under Arizona law, and that the murder of John Bunchek was for pecuniary gain. "[I]n the absence of any evidence to the contrary, we must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997). In light of this presumption, and in absence of evidence that the trial court considered Williams's prior unadjudicated acts when determining aggravating circumstances, we affirm the district court's rejection of this claim.

## XV

Williams claims that he was unconstitutionally denied the appointment of a mitigation investigator. Williams had the assistance of James Vance, an investigator who assisted the defense during the trial phase and who conducted a mitigation investigation during the sentencing phase. Williams argues that he was denied the resources to allow Vance to conduct an adequate investigation, and that Williams should have been appointed an additional private investigator.

There is no doubt that in appropriate circumstances a court must provide investigative help to ensure that an accused has received the effective assistance of counsel. We have previously held that "the effective assistance of counsel guarantee of the Due Process Clause requires, when necessary, the allowance of investigative expenses or appointment of investigative assistance for indigent defendants in order to insure effective preparation of their defense by their attorneys." *Mason v. Arizona*, 504 F.2d 1345, 1351 (9th Cir. 1974). For the appointment of an investigator to become constitutionally necessary, the defendant must show that the services of the investigator are required. *Smith v. Enomoto*, 615 F.2d 1251, 1252 (9th Cir. 1980) ("The present rule is that an indigent

defendant has a constitutional right to investigative services, but that such right comes into existence only when some need is demonstrated by the defendant.") (citation omitted); *see also Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985) ("Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision [to deny funds for various investigators].").

**[17]** The district court here found that Williams did not make the requisite showing of need for an additional mitigation investigator. On February 29, 1984, the trial court stated that it would grant Williams's request for funds if Williams made "some good faith showing . . . that there might be some benefit somewhere to the defense." Williams requested an additional investigator in a motion submitted on March 6, 1984, but gave no argument in support of that motion. And at no other time did Williams introduce evidence or argument in support of his request for an additional investigator. Because we conclude that Williams did not meet his burden of making a threshold showing that an additional investigator would be helpful, we hold that the trial court's denial of Williams's request for that other investigator was not constitutional error.

We similarly reject Williams's claim that it was constitutional error for the state trial court to deny Williams's request to fund a trip by Vance to West Virginia. The only information Williams submitted to the trial court regarding this request was a list of many people who lived in the area of West Virginia, where Williams was raised. Williams did not give any information other than possible witness names and that they would be helpful. Because Williams offered nothing more than "undeveloped assertions that the requested assistance would be beneficial," we cannot say there was constitutional error in denying the request for travel. Under the Supreme Court's standards for scope of potentially mitigating evidence, almost any statement by any person who knew Williams might have been admissible on the issue of mitigation,

subject to normal evidentiary rules restricting cumulative testimony. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."). But this does not mean that the state had an obligation to fund investigation into the background and knowledge of every person whom Williams had ever known who might comment about their experience with him, when Williams did not make a threshold showing that such an investigation would be helpful.

XVI

Williams argues that the trial court unconstitutionally denied his right to have certain witnesses appear at the presentence hearing, either by denying his request to fund their travel or by the trial court's denial of a continuance. Williams provided a list of 150 potential mitigation witnesses to Vance, and said that more names would be forthcoming. However, in his Supplemental Motion for Reconsideration to the Arizona Supreme Court, Williams argued that the trial court's denial of funds was unconstitutional regarding six witnesses: Robert Blakely, Beverly Dawson, Ronald Heath, Sadie Williams, Susan Brozek, and Rosemary Price. The district court confined its analysis to these six witnesses, and that was correct because the federal courts have jurisdiction in this habeas context to consider only claims that were exhausted in the state court. The district court assumed that all six were material witnesses, but held that the failure to compel the witnesses to attend did not have a substantial and injurious effect on the sentence, and therefore that the error was harmless.

**[18]** "[T]he Compulsory Process Clause guarantees a criminal defendant the right to present relevant and material witnesses in his defense . . . ." *Alcala v. Woodford*, 334 F.3d 862,

879 (9th Cir. 2003); *see Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 17-19 (1967). A material witness is "[a] witness who can testify about matters having some logical connection with the consequential facts, esp. if few others, if any, know about those matters." Black's Law Dictionary (8th ed. 2004). Although we have not previously recognized the right to compel material witnesses to testify in a presentence hearing, the Eighth and Fourteenth Amendments entitle a defendant to present relevant mitigating evidence at sentencing. *See Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). Accordingly, the failure to compel material witnesses to appear at a sentencing hearing in a capital case can be a constitutional violation. However, violations of the right to compulsory process are subject to harmless error review. *See United States v. Winn*, 767 F.2d 527, 531 (9th Cir. 1985).

On this appeal, Williams discusses five witnesses: Robert Blakely, Beverly Dawson, Ronald Heath, Sadie Williams, and Rosemary Price. He does not discuss Susan Brozek in his opening or reply brief, and therefore has abandoned his claim concerning this witness. Accordingly, we discuss only the other five witnesses.

Robert Blakely was a former parole officer who supervised Williams from 1965 until 1968. Blakely would have testified that Williams "is intelligent, courteous, cooperative, kind, and liked by everyone in the area." Further, he would have testified that Williams did so well in prison that Blakely helped Williams get early parole, that Williams was an "ideal parolee," and that he was a helpful person. The trial court found Blakely to be a material witness, but denied Williams's request for a continuance to allow Blakely, who was unavailable for the hearing, to appear. The trial court accepted that Blakely "would testify during the time he knew Mr. Williams that he was a positive force of [*sic*] his fellow prisoners."

Beverly Dawson was Petitioner's ex-wife, and Williams proffered to the trial court that she would have testified that

they cared very much for each other, and that Williams's current problems may have been the result of problems they had during their marriage. Dawson was unavailable for the hearing, and the trial court denied Petitioner's request for a continuance, but accepted that "she would say that their marriage was so bad that it may have affected him 20 years later."

Ronald Heath was a guard at the Moundsville Prison where Williams was incarcerated. Williams proffered that Heath would testify that Williams had a "strong character" and was a positive influence in the prison.

Williams proffered the following from Vance regarding the information Sadie Williams would provide:

> Sadie Williams is the defendant's mother. I spoke with her on numerous occasions. Mrs. Williams advised me that Ronald has never caused problems in West Virginia, and that she believed that he grew up as an ordinary boy and that he had a lot of love in his heart and would have, on numerous occasions, pick up stray dogs and cats and provide homes until they could be placed. Ron was a regular church goer and was known to help the older ladies across the railroad tracks to the church and she further stated that Mr. Williams on numerous occasions would give children money and that he also would buy clothes for children that could not afford them.

Rosemary Price was a juror at one of Williams's earlier murder trials. Williams stated that Price was a friend of his, with whom he regularly corresponded and conversed with by phone. Williams proffered that Price would have testified that Williams counseled her during her divorce and helped her cope.

**[19]** With the exception of Blakely, the trial court found that Williams failed to make a threshold showing that the tes-

timony of the witnesses would aid the defense. The trial court's finding is fairly supported by the record. *See Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001). None of the witnesses had substantial contact with Williams in the 10 years leading up to the trial, and it is not clear what their live testimony would have added to aid the defense in its case of mitigation. Even if the trial court erred by viewing the witnesses, apart from Blakely, as not material, that error was harmless. The trial court considered the proffered testimony of each witness in determining whether there was mitigating evidence.[11] And Williams has offered no evidence, such as affidavits of the witnesses, tending to show that their live testimony would have differed from the proffered testimony. Therefore, we hold that even if the denial of funds to allow Heath, Mrs. Williams, and Price to testify in person was a denial of Williams's right to compulsory process, any error was harmless.

Our analysis differs regarding Blakely and Dawson. The trial court found Blakely to be a material witness, and approved Petitioner's request to fund Blakely's travel. The trial court did not find that Dawson was a material witness. However, both Blakely and Dawson were unavailable during the presentence hearing, and the trial court denied Williams's request for a continuance. "Generally, a decision to grant or deny a continuance is reviewed for an abuse of discretion." *United States v. Studley*, 783 F.2d 934, 938 (9th Cir. 1986). Where a constitutional right is at issue, "a court must balance several factors to determine if the denial was 'fair and reasonable.' " *Id.* (quoting *United States v. Leavitt*, 608 F.2d 1290, 1293 (9th Cir. 1979) (per curiam)). These factors include, *inter alia*, whether previous continuances have been granted; whether the parties, the court, or counsel would be inconve-

---

[11]The state trial court explained that "[t]he Court has considered all aspects of the defendant's character, propensities, record . . . and all evidence offered by the defendant or the State which is relevant in determining whether to impose a sentence less than death."

nienced; whether there are legitimate reasons for the delay; whether the denial would prejudice the defendant; and whether the delay is the defendant's fault. *Id.*

[20] Applying those factors, we determine that there was no abuse of discretion by the state trial court in its decision not to grant a continuance to facilitate the appearance of Blakely and Dawson at the sentencing hearing. Williams repeatedly sought to delay the hearing by requesting continuances, drawing out hearings, and delaying in tendering his list of potential mitigation witnesses. And the trial court granted Williams a continuance for a month to allow him time to find mitigation witnesses on a previous occasion. Further, Williams has not demonstrated that he suffered prejudice as a result of the failure to grant the continuance. The trial court accepted the proffered testimony concerning Blakely and Dawson, and there is no indication that their live testimony would have differed from the proffered testimony. Accordingly, we deny Williams's request for relief on this ground.

## XVII

Williams argues that the trial court refused to consider relevant mitigating evidence. Specifically, he argues that the trial court refused to consider his troubled family history, that it refused to consider his claim that he was innocent of the prior murders for which he was convicted, and that it ignored "a variety of reasons that [Williams] should not die."

We have recognized a distinction between a failure to consider relevant evidence and a conclusion that such evidence was not mitigating. In a capital case, a sentencing judge cannot refuse to consider any relevant mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982) ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence."). Further, the sentencing court may not confine its

analysis to mitigating factors listed in the state sentencing statute. *Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987).

Although a sentencing court may not refuse to consider any relevant mitigating evidence, "a sentencer is free to assess how much weight to assign to such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see also Eddings*, 455 U.S. at 114-115 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."). Once mitigating evidence is allowed in, a finding that there are "no mitigating circumstances" does not violate the Constitution. *Ortiz*, 149 F.3d at 943. Further, the trial court is not required to "itemize and discuss every piece of evidence offered in mitigation." *Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc). But it must be clear to the reviewing court that the sentencing court considered all relevant mitigating evidence that was offered. *Id.* "It is sufficient that a sentencing court state that it found no mitigating circumstances that outweigh the aggravating circumstances." *Poland v. Stewart*, 117 F.3d 1094, 1101 (9th Cir. 1997).

Williams claims that the trial court did not consider the relevant mitigating evidence. But the record indicates otherwise. Regarding Williams's troubled family history, the trial court stated:

> The Court has considered evidence of defendant's family history, including the testimony that his father was an alcoholic who verbally abused and rejected the defendant, and that the defendant's grandfather and uncle encouraged him at an early stage of his life to engage in criminal conduct. The Court finds that none of this is a mitigating factor or calls for leniency in the present case; and that defendant has, without additional influence of his family, continued a life of crime, fully aware of the unlawfulness of his conduct, and fully capable both mentally and physi-

> cally of conforming his conduct to the requirements of the law at all times, including the times relevant to the offenses of which he has been convicted in this case.

To us, this passage indicates that the sentencing trial court considered all of the mitigation evidence that was presented concerning Williams's abusive family background, and nonetheless found Williams's mitigation case to be wanting.

Regarding Williams's claim that he was innocent of the prior two convictions, the trial court accepted Williams's proffer that the key witness against him in his first trial had recanted, and that he was convicted of felony murder for his second offense because he was not the triggerman. Frank Passarella, Petitioner's attorney during his first murder trial, testified at the presentence hearing about the lack of evidence linking Williams to that murder. Terry Britt, one of Petitioner's attorneys during his felony murder trial, also testified at the sentencing hearing in this case, stating that there was no evidence that Williams was the triggerman during that crime. The state trial court stated generally that the court considered all aspects of the defendant's character, propensities, and record, and the circumstances of the Bunchek murder, and that it considered all evidence offered by the defendant or state relevant to the sentencing determination. The trial court in sentencing was not required to discuss every piece of evidence. While admitting evidence of Williams's conviction of the prior offenses for which he was subject to life imprisonment, the trial court in the sentencing hearing permitted Williams to present evidence that he was innocent of the prior offense of murder, and that he was not the triggerman in connection with his prior offense of felony murder. The trial court in sentencing concluded that the evidence was not mitigating in context balanced against Williams's life of serious and deadly crimes.

**[21]** Finally, Williams claims that the trial court ignored "a variety of reasons that [Williams] should not die." If this is an

argument that the trial court did not make particularized findings as to each of Williams's proffered mitigating circumstances, then that argument is foreclosed by *Jeffers. See* 38 F.3d at 418. If this is an argument that the trial court did not consider other evidence offered in mitigation, then the premise is incorrect because the trial court considered all evidence Williams offered in support of mitigation. In sum, the trial court considered relevant mitigating evidence, weighed it against aggravating circumstances, and concluded that mitigation was not warranted. The state trial court's process of deciding that death was a condign punishment for Williams did not violate the Eighth or Fourteenth Amendments, and Williams is not entitled to relief on this claim.

## XVIII

**[22]** In 2002 the U.S. Supreme Court held that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)). Williams argues that *Ring* should apply retroactively. However, that argument is foreclosed by *Schriro v. Summerlin*, 542 U.S. 348 (2004), which held that "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review." *Id.* at 358.

Williams attempts to avoid *Summerlin* by relying on *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir. 1988) (en banc). There, we held that the Arizona statutory scheme for imposing the death penalty violated the Sixth Amendment because aggravating circumstances were found by a judge, rather than by a jury. *Id.* at 1023-29. *Adamson* was the law when Williams's appeal was before the Arizona Supreme Court. However, while Williams's appeal was pending before the U.S. Supreme Court, that Court decided *Walton v. Arizona*, 497 U.S. 639 (1990), which effectively overruled *Adamson*. *Id.* at

647; *see Richmond v. Lewis*, 921 F.2d 933 (9th Cir. 1990) ("The Supreme Court granted certiorari in *Walton* specifically *because of* this circuit's en banc holding in *Adamson*, and *Walton* reached the opposite conclusion regarding the Arizona statute's constitutionality.") (footnote omitted). *Walton* was the law before Williams's appeal became final on direct review, which includes review in the U.S. Supreme Court, and *Adamson* is therefore unavailing.

## XIX

Williams contends that the psychiatrist and psychologist who conducted mental health evaluations pursuant to Rule 26.5 were incompetent. He argues that each of them should have conducted an extensive social and medical history, that they should have conducted unspecified physical and neurological tests, and that the tests they did perform were incomplete and incompetently conducted. The district court held that Williams did not show that the two court-appointed experts were incompetent, that he failed to identify which tests should have been conducted, and that his blanket assertions that the tests were incomplete were insufficient to support the charge.

**[23]** Petitioner points to no evidence generated at trial, sentencing, or during the more than twenty years since then, showing that the two experts were incompetent. Williams offers no affidavits from medical experts supporting that the two experts were incompetent, gives no list of the tests that in his view should have been conducted or what those tests may have shown, and offers no evidence showing that the tests that the experts conducted were incomplete. Because the record does not contain evidence from Petitioner indicating that the prior medical experts were incompetent, the district court correctly held that this claim does not require relief.

Petitioner's request for an evidentiary hearing on this claim is unsupported, and is denied.

## XX

**[24]** Next, Williams argues that Arizona's treatment of pecuniary gain as an aggravating circumstance is facially unconstitutional because it does not "genuinely narrow the class of persons eligible for the death penalty" and does not "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). However, we rejected that argument in *Woratzeck v. Stewart*, 97 F.3d 329 (9th Cir. 1996), where we observed:

> It is not true that everyone convicted of robbery felony-murder is automatically death eligible. The State needs to prove at sentencing that the killing was done with the expectation of pecuniary gain. Even if it is true that under many circumstances a person who kills in the course of a robbery is motivated to do so for pecuniary reason, that is not necessarily so. A defendant is free to argue that the killing was motivated by reasons unrelated to pecuniary gain.

*Id.* at 334-335 (citation omitted). We concluded that the Arizona statute "sufficiently channels the sentencer's discretion and does not result in unconstitutionally disproportionate imposition of the death penalty when applied to felony-murder defendants." *Id.* at 335. Applying this prior precedent, we reject Williams's argument that the pecuniary gain aggravating factor is facially unconstitutional.

**[25]** In the alternative, Williams argues that the evidence was insufficient to establish that he killed Bunchek for pecuniary gain. As we noted above with regard to the guilt phase, we examine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

(1979). The state trial court found that Bunchek was killed because he discovered a burglary in progress, and that pecuniary gain was a motivating circumstance. A rational trier of fact could have found beyond a reasonable doubt that Williams killed Bunchek for pecuniary gain, and hence the evidence was sufficient.

## XXI

Williams argues that the Arizona death penalty statute is unconstitutional as applied to him because his sentence is arbitrary and capricious. He argues that the "trial and appellate courts agreed Petitioner proved his innocence of the prior two convictions," and therefore that the trial court unconstitutionally considered the prior convictions aggravating factors.

[26] We reject this argument, which mischaracterizes the record. The state trial and appellate courts did not agree that Williams proved his innocence of the prior convictions. Rather, the state trial court accepted Williams's proffer that the key witness in his first murder trial recanted, and that his second conviction was for felony murder, not premeditated murder. This testimony, even when credited, is not the equivalent of a finding that Williams was innocent of the prior offenses. Further, the trial court considered Williams's claim of innocence of the prior offenses in the context of mitigation. After weighing the evidence the state trial court found that Williams did not establish mitigation. Petitioner's claim that the trial court found him innocent of the prior offenses is not correct, and as a result his claim that the death penalty is unconstitutional as applied to him fails.

Williams also argues that the death penalty is unconstitutional here because "there is significant doubt whether Petitioner committed this crime." Although the case against Williams was based on circumstantial evidence, we held above that the evidence—including Williams's gun, footprint and flight—was sufficient to support his conviction, and that

his trial was not constitutionally defective. Williams has not offered any new evidence to cast doubt on his conviction for the murder of John Bunchek. Williams's assertion that there is doubt about whether he committed this crime is foreclosed by the jury's determination of his guilt beyond a reasonable doubt, and our determination that there was sufficient evidence for the jury to so conclude.

Petitioner's alternative request for an evidentiary hearing is unsupported, and once more we determine that there was no basis for requiring a hearing.

## XXII

The district court found that Williams's claim that execution by lethal injection violates the Eighth Amendment was procedurally defaulted. Williams concedes that this claim was not presented to the Arizona courts. However, Williams argues that he could not have raised the claim in his state proceedings because the facts supporting the claim had not yet been discovered.

Williams's claim is based on the 1995 affidavit of a pathologist, Dr. Karen Griest, who reviewed an autopsy report of James Clark, who was executed in 1993 by lethal injection. Dr. Griest states that in Arizona lethal injection is administered in a way that causes extreme suffering and torture. Williams also relies upon a statement from Dr. Brunner. Dr. Brunner concluded that Clark and John Brewer, who was executed by lethal injection in 1993, likely experienced suffering and torture.

[27] We may not reach the merits of procedurally defaulted claims, that is, claims "in which the petitioner failed to follow applicable state procedural rules in raising the claims . . . ." *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992). Under Arizona law, a claim is procedurally defaulted if it is not raised in compliance with Arizona Rule of Criminal Procedure 32. *Ari-*

*zona v. Carriger*, 692 P.2d 991, 995 (Ariz. 1984) ("Failure to comply with Rule 32 procedure will result in a finding that petitioner waived his right to present a Rule 32 petition."). Rule 32.1(e) allows a petitioner to seek post-conviction relief if:

> Newly discovered material facts probably exist and such facts probably would have changed the verdict or sentence. Newly discovered material facts exist if:
>
> (1)   The newly discovered material facts were discovered after the trial.
>
> (2)   The defendant exercised due diligence in securing the newly discovered material facts.
>
> (3)   The newly discovered material facts are not merely cumulative or used solely for impeachment, unless the impeachment evidence substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence.

Rule 32.1(e), Ariz.R.Crim.P., 17 A.R.S.

The first factor of the Rule 32.1 test is not in dispute. The facts Williams relies upon were discovered by him in 1995, long after his trial and presentence hearing. However, the district court held that Williams did not satisfy the second factor of the Rule 32.1 test, concluding that Williams did not exercise due diligence in obtaining the evidence. Although Williams alleged that he did not discover the evidence, in the form of the statements of Drs. Griest and Brunner, until 1995, the district court found that Williams provided no reasons why he could not have discovered these facts before filing his supplemental petition for post-conviction relief to the Arizona courts, which he filed on January 26, 1994.

**[28]** We agree with the district court. Williams does not explain why he did not seek evidence between the time when Arizona introduced lethal injection as a mode of execution in late 1992 and when Williams filed in 1994 his supplemental petition for post-conviction relief in the Arizona courts.

Williams requests an evidentiary hearing, but points to no evidence in the record that is contested, and so we deny this request.

## XXIII

We reject Williams's challenges to the district court's denial of Williams's Amended Petition for Writ of Habeas Corpus.

**AFFIRMED.**