# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GEORGE LOPEZ,
          *Petitioner-Appellant,*

v.

DORA B. SCHRIRO,* Arizona
Department of Corrections
Director; MEGAN SAVAGE, Warden,
          *Respondents-Appellees.*

No. 06-99000

D.C. No.
CV-97-00224-CKJ
District of Arizona,
Tucson

OPINION

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
March 6, 2007—Tucson, Arizona

Filed June 20, 2007

Before: Michael Daly Hawkins, Sidney R. Thomas, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Hawkins;
Partial Concurrence and Partial Dissent by Judge Thomas

---

*Dora B. Schriro is substituted for her predecessor, Terry L. Stewart, as Arizona Department of Corrections Director, pursuant to Fed. R. App. P. 43(c)(2).

## COUNSEL

Cary Sandman, Waterfall, Economidis, Caldwell, Hanshaw & Villamana, P.C., Tucson, Arizona, for the petitioner-appellant.

Robert J. Gorman, Arizona State Attorney General's Office, Tucson, Arizona, for the respondents-appellees.

## OPINION

HAWKINS, Circuit Judge:

Appellant George Lopez ("Lopez") was convicted in Arizona state court of child abuse and felony murder of his one-year-old son and sentenced to death. In this post-Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") habeas proceeding, he presents one certified issue: whether the state trial court denied Lopez his rights

under the Eighth Amendment by failing to consider mitigation evidence presented at trial. He also seeks to expand the certificate of appealability ("COA") to include four additional issues, including the Arizona Supreme Court's review of his death sentence and three ineffective assistance of counsel claims. We affirm in part, reverse in part, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

The relevant facts pertaining to the death of Lopez's son, Anthony, are set forth in the Arizona Supreme Court's opinion on direct review:

> Lopez met a woman in 1987 while he was coaching a coeducational softball team. He soon began having an affair with her and she became pregnant with his child in December 1987. Five months before the child was born, Lopez left his wife and moved in with the mother and her three-year-old son. The baby, named Anthony, was born in August 1988.
>
> One year and nine days later, August 26, 1989, Anthony's mother left the apartment at 10:00 a.m. to go shopping. She took her older child with her and left Anthony in Lopez' care. When she returned around noon, Lopez told her an accident had happened. He explained that while he was disposing of a soiled diaper in another room, Anthony had gotten off the bed and pulled a nightstand over on himself. Anthony's mother saw that he had a bruise on his forehead and another under his chin. She wanted to take Anthony to the hospital, but Lopez refused, saying Anthony would be all right.
>
> She held Anthony for a while and then laid him down. He soon wanted to be held again and she noticed that he was hot. She bathed him with alcohol

and held him again. She again told Lopez that they should take the child to the hospital, but Lopez again refused.

Anthony's mother had to do some laundry, so Lopez carried the laundry to the laundry room. When he returned, she left Anthony with him and went to put the laundry in the washing machines. When she returned to the apartment, she found Lopez performing cardiopulmonary resuscitation (CPR) on Anthony. They then took Anthony to the emergency room at University Medical Center (UMC). Emergency room personnel unsuccessfully attempted to resuscitate Anthony; he was declared dead at 3:36 p.m.

The police were summoned to the hospital and Officer Mardula spoke with the emergency room physician, examined the injuries to Anthony's body and then asked Lopez if he would speak with her and he agreed. Lopez had tears in his eyes, but appeared calm and rational. Officer Mardula read Lopez his *Miranda* rights and then asked him what had happened to Anthony. Lopez related the same facts that he had previously related to Anthony's mother. He stated that he examined the baby and determined he was "okay," but closely watched him. He stated that later when he was helping the mother with the laundry, he noticed that Anthony was not breathing. He performed CPR on the baby and then he and the mother took Anthony to the hospital. He became upset at this point, so Officer Mardula ended the interview.

Shortly after 5:00 that evening, Detectives Miller and Salgado approached Lopez at the hospital and asked him to accompany them to a room, adjacent to the emergency room, provided by the hospital for

paramedics and police officers to do paper work. Lopez appeared calm. Detective Miller explained to Lopez that they wanted to tape record their interview and then asked him how Anthony was injured. Lopez stated that he and Anthony's mother were home, heard a crash in the bedroom and when they went to investigate, found Anthony lying face down under the tipped-over nightstand. However, later in the interview, Lopez changed his story. He admitted that the mother was not at home. He stated that he had left Anthony on the bed while he disposed of a diaper. When he returned, he saw Anthony with one foot in the middle drawer of the nightstand reaching for a piggybank. He yelled at Anthony, startling him. Anthony then jerked back and tipped the nightstand over on himself. He landed under the nightstand, face up.

Detective Salgado told Lopez he did not believe him and said the truth had to come out. Lopez denied any wrongdoing, and Detective Salgado said, "George, you're playing games with us now, George." Lopez finally admitted that he hit Anthony on the buttocks. Detective Salgado then read Lopez his *Miranda* rights. Lopez indicated that he understood his rights and would continue to answer questions. He never requested an attorney nor did he refuse to answer any of the detectives' questions, which he appeared to understand. The detectives concluded the interview and left the room at approximately 7:00 p.m.

While Lopez was being interviewed by Detectives Miller and Salgado, Detective Millstone, a member of the homicide detail, arrived at the hospital. Detective Millstone interviewed Lopez and pointedly asked him if he had ever struck Anthony in anger. Lopez denied striking the child. Detective Millstone thought that the tape recorder was affecting Lopez'

candor, so he turned it off and asked Lopez what concerns he had about answering questions. Lopez told the detective he was afraid Anthony's mother might hear the tape. The detective told Lopez that he was not going to play the tape for her nor relate the details of the interview to her.

Detective Millstone then turned on the tape recorder and Lopez began to tell his version of how Anthony received his injuries. He stated: "I got angry, I got angry at everything, everything that has been boiling over. I've been very angry these past couple of days and [the mother] knows that and everybody knew it." Lopez stated that earlier that day, he had given Anthony a bath and laid him down to put lotion on him and "he peed, so I smacked him." Then Lopez stated: "And I smacked him hard and he started crying and I got angry, so I got the diaper and went and threw it away and that's when I saw him." At this time, Lopez recounted yet another version of the cause of Anthony's injuries. This time, after Anthony climbed on the nightstand and Lopez yelled at him, Anthony grabbed the lamp as he fell beneath the nightstand. Lopez jumped toward the nightstand to prevent it from falling on Anthony, but instead he fell on top of the nightstand. Then the radio, which had been on the nightstand, fell and hit Anthony in the face. Detective Millstone concluded the interview at 7:22 p.m.

Detective Millstone then spoke with the treating physician and the medical examiner who told him that the injuries Anthony suffered were not consistent with Lopez' stories. A telephonic search warrant was obtained for Lopez' apartment. Lopez went with the police officers to the apartment and demonstrated how Anthony was injured. After the demonstration, Lopez was arrested.

The next day, an autopsy was performed on Anthony. The doctor found numerous bruises on Anthony's face, chest, back and buttocks. Some bruises had occurred within 24 hours, but many were older. Anthony's skull was fractured in two places, one of which had been caused with such force that part of the fractured skull had been driven into the brain. Anthony also had an extensive hemorrhage in the membrane separating the brain from the skull.

The internal examination revealed that Anthony's 10th and 11th ribs were fractured near his spine. These injuries corresponded to the bruises on Anthony's back. These fractures had been caused within 24 hours of death. The doctor also found that Anthony's 7th, 8th and 10th ribs had been broken in the past and were healing when Anthony died. Anthony's pancreas was torn in two, his bowel and the membrane holding it in place were lacerated, and his spleen and adrenal gland had bled. The abdominal injuries had caused peritonitis. All of these injuries had been caused within 24 hours of death. The doctor determined that Anthony had died of blunt-force trauma to the head, chest and abdomen.

*State v. Lopez*, 847 P.2d 1078, 1081-83 (Ariz. 1992).

Lopez was indicted on one count of first-degree murder and one count of child abuse, and a jury convicted him on both counts. At an aggravation/mitigation hearing conducted prior to sentencing, Lopez put on numerous friends and family members as witnesses, who testified that Lopez was a non-violent person who liked to help people and that he had never acted inappropriately toward their children or his own. Various community members testified concerning Lopez's service in community organizations and the military, and about his positive employment history. A prison chaplain testified that Lopez was a cooperative and well-behaved inmate who regu-

larly attended Bible study classes and helped other inmates, and could carry out his mission of helping others if given a life sentence. Another prison official testified that Lopez was cooperative and had no disciplinary reports.

The prosecution presented testimony from an expert witness, Dr. Hobeich, a pediatrician with expertise in child abuse. Dr. Hobeich testified about the pain Anthony likely experienced from his injuries, which he compared to "surgery without anaesthesia." He also described symptoms of a child with Anthony's injuries, including being "hot to the touch" and "lethargic" and lacking the power or energy for a full cry, making more of a "cat cry" instead to communicate pain before eventually losing consciousness. Dr. Hobeich testified that Anthony was probably conscious and in pain for at least an hour, and that there was at least a possibility he could have survived his injuries if he had received treatment for them sooner. In closing arguments to the court, defense counsel relied on the mitigating evidence presented at the aggravation/ mitigation hearing, but also made a substantial argument that the record did not demonstrate that Lopez ever intended to kill his son. The trial court found the state had proved two aggravating factors: that the defendant committed the offense in an especially heinous, cruel and depraved manner, and that the defendant was an adult and the victim was under the age of fifteen. The court found no statutory mitigating circumstances and indicated it had considered "all evidence presented by the defendant by way of mitigation."

The court concluded:

> The victim, a child of 12 months and 9 days of age, was at the mercy of the defendant with no ability to protect or defend himself. His suffering was apparent or foreseeable, but defendant's selfish concern to shield himself from the consequences of his own actions caused him to deny the child any hope for life or the surcease of his pain through medical treat-

> ment. The Court finds that the cruelty and depravity of defendant's acts towards the innocent, helpless baby in his care far outweigh any evidence which might call for leniency.

The court then imposed the death penalty.

On direct appeal, a majority of the Arizona Supreme Court affirmed the conviction and sentence. *Lopez*, 847 P.2d at 1092. The majority indicated it was undertaking an independent review of the record to determine whether the death sentence was appropriate, and concluded that the evidence supported the finding on the two aggravating factors, and that the trial court could properly find that the record refuted the proffered mitigation evidence. *Id.* at 1090-92. Two justices dissented from the imposition of the death sentence, faulting the trial court for failure to comply with an Arizona statute requiring specific findings regarding mitigating circumstances. *Id.* at 1092-93 (citing Ariz. Rev. Stat. § 13-703 (D)).

Lopez then sought state collateral relief, raising, among other things, a number of claims regarding ineffective assistance of trial and appellate counsel. Following an evidentiary hearing, the superior court denied Lopez's petition in its entirety. Lopez then filed a petition for review with the Arizona Supreme Court, again raising a number of ineffective assistance of counsel claims, including allegations that his counsel had "abandoned" him at the sentencing stage. The Arizona Supreme Court issued a postcard denial of this petition. Lopez's petition for writ of certiorari to the United States Supreme Court was also denied.

Lopez then initiated this habeas action in federal district court. The district court found several claims to be unexhausted and dismissed those claims. Lopez subsequently returned to the state superior court, which denied some claims on procedural grounds and others on their merits. Petitions to the Arizona Supreme Court and United States Supreme Court

were also denied. Lopez then returned to the district court and moved to amend his petition to add these now-exhausted claims, but the district court denied the motion, holding that amendment would be futile and would cause undue delay and prejudice to the government. The district court denied relief on the remaining claims on their merits. The district court then *sua sponte* issued a COA on the issue of whether Lopez's constitutional rights were violated by the sentencing court's failure to consider and give effect to mitigation evidence presented at trial.[1]

## STANDARD OF REVIEW

The district court's denial of habeas relief is reviewed *de novo*. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005), *cert. denied sub nom.*, *Barker v. Spalding*, 126 S. Ct. 2041 (2006).

Lopez's appeal is governed by AEDPA. Under AEDPA, this court may not grant a writ of habeas corpus on behalf of a person in state custody unless the state's adjudication of his claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In assessing whether a state court's application of law or determination of fact is "unreasonable," the court cannot simply consider whether it would have reached a different out-

---

[1]The court also issued a COA as to whether Lopez's claim that his rights were violated when the sentencing court improperly limited the scope of mitigation evidence was procedurally barred. However, Lopez concedes that this second issue is either moot or immaterial since the district court reached the claim on its merits.

come on the same record. *Rice v. Collins*, 126 S. Ct. 969, 976 (2006) (stating that "[r]easonable minds reviewing the record might disagree about" the ultimate issue is insufficient for habeas relief). Rather, "[t]he 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 410, 412 (2000)). It requires the decision to be "objectively unreasonable." *Id.* (citing *Williams*, 529 U.S. at 410).

## DISCUSSION

### I. The Sentencing Court's Alleged Failure to Consider and Give Effect to Mitigating Evidence Presented at Trial

[1] Lopez's one certified claim alleges that the state sentencing court failed to consider and give effect to all the mitigating evidence he presented. Lopez relies principally on *Eddings v. Oklahoma*, 455 U.S. 104 (1982), which held that a sentencing court could not refuse to consider a petitioner's unhappy upbringing and emotional disturbance as mitigating evidence.

[2] Here, however, the sentencing court did not prevent Lopez from presenting any evidence in mitigation, nor did it affirmatively indicate that there was any evidence it would not consider. Indeed, the sentencing court expressly stated that it "ha[d] considered all evidence presented by the defendant by way of mitigation." Lopez acknowledges this statement, and also admits that a court is usually deemed to have considered all mitigating evidence where the court so states. *See Clark v. Ricketts*, 958 F.2d 851, 859 (9th Cir. 1992); *Parker v. Dugger*, 498 U.S. 308, 314 (1991) ("We must assume that the trial judge considered all this evidence before passing sentence. For one thing, he said he did.").

Lopez argues that the court's statement is insufficient in this case because the judge made contradictory statements

earlier during the aggravation/mitigation hearing which suggested she was excluding a "whole category of mitigation evidence"— evidence which was offered at trial but not re-introduced at the sentencing hearing. The genesis of Lopez's argument is the court's statement early in the proceedings that "[a]s to [the murder count] the Court is considering only those factors presented at the aggravation/mitigation hearing." However, when the statement is placed in context, it does not carry the meaning Lopez would assign to it.

**[3]** At the beginning of the sentencing hearing, the court ruled on various motions by Lopez to exclude statements by himself and the victim's family which appeared in the presentence report. The court granted Lopez's motion to strike these statements, "consistent with the Court's decision to rely upon evidence *received in trial and the presentence hearing*." (emphasis added). Shortly thereafter, the court stated:

> For the record, the Court has read the presentence report, the letters and other documents submitted by the defendant in the time period since the verdict was entered — largely since the presentence was prepared and filed, as well as this Court's *having heard the trial* and the aggravation/mitigation hearing on May the 10th, 1990.

(emphasis added). Having referenced the presentence report, the Court then went on to clarify, consistent with its earlier ruling:

> As to [the murder count], the Court is considering only those factors presented at the aggravation/ mitigation hearing.
>
> As to [the child abuse count], the Court is considering the information set forth in the presentence report.

> The Court does not rely upon any information set forth in the defendant's or the victim's statements in the presence report.

When the court's statement is put in this context, it is apparent that the judge was not announcing she was confining her consideration to only evidence that was introduced at the aggravation/mitigation hearing, but rather attempting to restate her ruling that she would not consider the statements in the presence report.

Lopez argues that the statement is at least ambiguous and that we should not speculate as to whether all the mitigating factors were actually considered. As discussed above, however, the sentencing court's statement is susceptible of Lopez's interpretation only if read in isolation, and is certainly not enough to overcome the presumption that the state court knew and followed the law. *See Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Under AEDPA, we must do more than find the statement ambiguous—we would have to conclude that the Arizona Supreme Court was *objectively unreasonable* in concluding the sentencing court did, in fact, review all the proffered mitigating evidence. *See Lockyer*, 538 U.S. at 75. Relying on the sentencing court's express statements that it had read the presence reports, heard the trial and the aggravation/mitigation hearing, and considered all evidence presented by Lopez, the Arizona Supreme Court concluded that "[t]he record before us clearly indicates that the trial judge considered all the mitigating factors presented by Lopez." *Lopez*, 847 P.2d at 1091. This is not an *unreasonable* determination of the facts in light of the record before it. *See Parker*, 498 U.S. at 314-15 (assuming trial judge considered all mitigating evidence before passing sentence because he said he did and state law required him to).[2]

---

[2]This court reviews the Arizona Supreme Court's decision because it is the last reasoned decision on this issue. *Barker*, 423 F.3d at 1091-92. The determination of what the trial judge found is an issue of historical fact. *Parker*, 498 U.S. at 320.

Moreover, the sentencing judge clearly made findings that were based on trial evidence, thus negating the argument that the court only considered evidence from the aggravation/mitigation proceeding. For example, the court found that Lopez "willfully and intentionally" abused the child, that the baby was entrusted to Lopez's care, and that Lopez denied the child medical treatment to protect himself, although the actual circumstances of the crime and aftermath were not discussed by witnesses at the penalty phase hearing. In fact, it appears that at one point Lopez similarly viewed the record, as in one of his state post-conviction petitions, he asserted: "At sentencing, this court imposed the death penalty; it appears this court reached its decision to impose death *in part from testimony at the guilt phase of the trial*." (emphasis added).

Lopez contends that the trial court must have failed to consider the trial record because it did not find the lack of intent to kill as a mitigating factor. Of course, the trial court did not specifically discuss *any* of the mitigating evidence that Lopez presented, so a failure to discuss this factor does not necessarily indicate it was not considered. In addition, on the date the court pronounced sentence, Lopez's counsel made an argument before the court that was primarily based on the lack of intent to kill.[3]

[4] In light of the foregoing, we agree with the district court that the Arizona Supreme Court was not objectively unreasonable in determining that the sentencing court had considered

---

[3]The sentencing court found that Lopez had "willfully and intentionally physically abused the child entrusted to his care and caused his death." Lopez argues that this statement simply underscores that the court did not find an "intent to kill," just intent to abuse, but the state argues that the "willfully and intentionally" language also modifies "caused his death." Because either interpretation is plausible, the statement is at best ambiguous, and does not cut strongly one way or the other.

all of Lopez's proffered mitigating evidence, including the evidence presented at trial.[4]

## II.  Meaningful Appellate Review

[5] After the district court *sua sponte* issued the COA as to Issue I, Lopez asked this court to expand the COA. A motions panel denied this request, but indicated Lopez could re-raise these issues in his opening brief, which he has done. We construe this additional briefing as a further motion to expand the COA. *See* Circuit Rule 22-1(e). To receive a COA, Lopez must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

[6] Lopez argues that the Arizona Supreme Court failed to provide meaningful independent review of his sentence. This issue is not, as Lopez argues, somehow encompassed by the certified issue discussed above. To the contrary, the district court expressly limited its COA to alleged errors committed by "the sentencing court[ ]." Rather, Lopez raises an entirely independent constitutional claim[5] regarding the Arizona Supreme Court's review process, alleging that the Court mistakenly determined that the trial court found "no mitigation," when the trial court in fact weighed the mitigating factors against the aggravators. This claim is not only unexhausted,

---

[4]Because we agree with this conclusion, we need not address the district court's alternate holding that even if the trial court had erred and failed to consider all the mitigating evidence presented at trial and sentencing, any such error was cured by the Arizona Supreme Court's independent review of the record.

[5]The Eighth and Fourteenth Amendments prohibit the government from imposing the death penalty in an arbitrary or irrational fashion, and the Supreme Court has held that "meaningful appellate review" is necessary to ensure that the death penalty is not imposed in such a manner. *Pulley v. Harris*, 465 U.S. 37, 45 (1984) (citing *Gregg v. Georgia*, 428 U.S. 153, 198, 204-06 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)); *Parker*, 498 U.S. at 321.

it is actually raised for the first time on this appeal.[6] We therefore deny a COA on this issue.

**[7]** Lopez also attempts to sweep this claim within one he did raise below in the district court: that the state trial court made constitutionally inadequate findings. Lopez argued below that the trial court's failure to list the factors it considered and its conclusions surrounding them violated due process and made it impossible for the Arizona Supreme Court to perform its independent duty of review. However, Lopez does not point to any "clearly established" Supreme Court precedent setting forth the record the sentencing court must make in order to permit sufficient appellate review. *See* 28 U.S.C. § 2254 (d)(1). The district court thus denied Lopez's claim, noting that there was no clearly established Supreme Court law or constitutional requirement "that a particular sentencing record be produced by the trial court." We agree, and have expressly held that "[w]hile it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence . . . due process does not require that the sentencer exhaustively document its analysis of each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant." *Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (citing *Gardner v. Florida*, 430 U.S. 349, 361 (1977) (plurality opinion)); *see also Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006) ("[T]he trial court is not required to 'itemize and discuss every piece of evidence offered in mitigation' . . . [so long as it makes] clear to the reviewing court that the sentencing court considered all relevant mitigating evidence that was offered."); *Clark*, 958 F.2d at 858 n.5 (not-

---

[6]The only error in the Arizona Supreme Court's review that Lopez alleged in his federal habeas petition was the Court's failure to conduct proportionality review of his death sentence. In addition, in Lopez's state and federal filings, he consistently asserted—contrary to his assertion now—that the trial court *had* made an (erroneous) finding of "no mitigation."

ing that after *Parker*, it is clear the "due process clause does not require the sentencing court to conduct an on-record discussion of each mitigating factor"). Because the district court's determination on the merits of this claim is not debatable among jurists of reason, we deny the COA on this uncertified claim.

### III. Exhaustion of Ineffective Assistance of Counsel Claim Regarding Failure to Investigate and Present Reasonably Available Mitigating Evidence

In his federal habeas petition, Lopez asserts that his counsel rendered ineffective assistance by failing to investigate and present all relevant mitigating evidence at sentencing, including evidence of organic brain damage, dysfunctional childhood, childhood sexual assault, a good employment record and remorse. The district court did not reach the merits of this claim, however, because it found this issue had not been exhausted to the Arizona Supreme Court.

Because the district court dismissed Lopez's claim on a procedural ground, we apply *Slack* to both the procedural ground and the underlying constitutional claim to determine if they are debatable among jurists of reason. *Valerio v. Crawford*, 306 F.3d 742, 774 (9th Cir. 2002). With respect to the substantive prong, however, we take only a "quick look" to determine whether the petition facially alleges the denial of a constitutional right. *Id.* at 775 (internal quotation marks omitted).

**[8]** In order to fulfill exhaustion requirements, a petitioner must present to the state courts the "substantial equivalent" of the claim presented in federal court. *Picard v. Connor*, 404 U.S. 270, 278 (1971). "[S]tate courts have been given a sufficient opportunity to hear an issue when the petitioner has presented the state court with the issue's factual and legal basis." *Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999). However, a petitioner may provide further facts to sup-

port a claim in federal district court, so long as those facts do not "fundamentally alter the legal claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

Lopez did seek post-conviction relief in Arizona Superior Court pursuant to Arizona Rule of Criminal Procedure 32. He alleged, among other things, that he had received ineffective assistance of counsel in violation of *Strickland v. Washington*, 466 U.S. 668 (1984). Although the state correctly notes that Lopez's initial bifurcated petition did not specifically challenge counsel's lack of preparation for the penalty phase, the issue was eventually briefed in memoranda to the state trial court, and that court did issue a ruling on the merits.

The state court also permitted an evidentiary hearing on Lopez's claim. At the evidentiary hearing, Lopez presented evidence about his trial counsel's failure to investigate and present mitigation for the capital sentencing, as well as expert testimony about an allegedly competent defense attorney's duties of investigation and presentation of mitigating evidence. An expert testified that competent defense counsel had a duty to investigate Lopez's background and social history, and as a result of counsel's failure to do so, the sentencing judge did not discover that Lopez grew up in a dysfunctional household with alcoholic parents and also began drinking at an early age. The expert also testified that trial defense counsel failed to provide the examining psychologist with any evidence of family, medical or social history.

The state court rejected this claim on the merits, concluding that evidence of Lopez's alcohol abuse was not sufficiently substantial to call for leniency. Lopez then appealed the denial to the Arizona Supreme Court. In his statement of issues, Lopez indicated he was prejudiced by his trial counsel's "abandonment [of] his client at the trial and/or sentencing." He identified *Strickland* as the governing federal constitu-

tional standard. His petition for review elaborated on the claim as follows:

> Mr. Bruner [trial counsel] for all appearances turned over the mitigation preparation to Ms. Marshall, his junior counsel, who had previously done no serious trials including murder and/or death penalty trials. Mr. Bruner gave no direction to Dr. Morris [evaluating psychiatrist] as to the evaluation, other than Mr. Bruner wanted to know about "overall personality dynamics, and things of this nature. Wasn't asking for anything specific to help the case, but was interested in learning more about the psychological makeup of Mr. Lopez." Most importantly, Dr. Morris was not asked to evaluate or render an opinion as to the statements given by Mr. Lopez to law enforcement. Mr. Bruner believed that the death penalty would not be imposed in this case and prepared accordingly.

The Arizona Supreme Court denied Lopez's petition.

[9] We conclude that the district court erred by determining that Lopez's ineffective assistance of counsel claim for failure to investigate and present mitigating evidence was unexhausted. Lopez did at least make the general allegations of his counsel's lack of penalty phase preparation to the Arizona Supreme Court (including improper delegation to an inexperienced subordinate and failure to prepare mental health experts), and the state court record contains some evidence of a dysfunctional childhood and alcoholism.[7] A "quick look" at

---

[7]We recognize that Lopez's habeas counsel conceded to the federal district court that some sub-parts of this claim were not exhausted by post-conviction counsel. However, this court can independently review the state court record to determine whether the issue has actually been exhausted. *See Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988) (per curiam).

the merits of his federal claim also reveals that Lopez has sufficiently alleged the deprivation of a constitutional right. *Valerio*, 306 F.3d at 775. We therefore grant the COA on Lopez's penalty phase ineffective assistance claim for failure to investigate and present mitigating evidence and remand to the district court for further proceedings.[8]

## IV. Procedural Bar Regarding Defense Counsel's Failure to Rebut Testimony by Dr. Hobeich

In his federal petition, Lopez claims that his trial counsel was also ineffective for failing to rebut the testimony of the state's aggravation witness, Dr. Hobeich, who presented testimony about the pain Lopez's son likely suffered before death. The district court first found this claim to be unexhausted, and then, procedurally barred on an adequate and independent state law ground. As with the previous claim, we analyze whether to grant a COA by applying the *Slack* standard to the district court's procedural ruling and to the underlying constitutional claim. *Valerio*, 306 F.3d at 774.

In December 2000, Arizona amended its Rule 32 state post-conviction procedures, adding a new avenue of relief from a death sentence if "[t]he defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish . . . that the court would not have imposed the death penalty." Ariz. R. Crim. P. 32.1(h). After the district court dismissed Lopez's claim as unexhausted, in

---

[8]We note that Lopez apparently wishes to supplement the record in federal court with additional evidence of prejudice — information that could have been presented in the penalty phase mitigation proceeding, but was not presented due to defense counsel's allegedly deficient performance — that was not presented to the state courts. On remand, the district court will therefore need to determine whether Lopez, who received an evidentiary hearing in state court, is entitled to supplement the record or receive an additional evidentiary hearing in federal court. *See* 28 U.S.C. § 2254(e)(2); 28 U.S.C. foll. § 2254, R.7 (setting forth the rule for expanding the record on federal habeas review).

1999 Lopez returned to state court, seeking relief under this provision by arguing that his counsel's deficient performance deprived the state court of evidence that would have changed his sentence. The state trial court, however, held the claim precluded under Rule 32.2(a)(3),[9] concluding the claim could have been presented in Lopez's first post-conviction proceeding. *See* Ariz. R. Crim. P. 32.2(a)(3) (providing for dismissal of a claim that "has been waived at trial, on appeal, or in any previous collateral proceeding."). Lopez sought review with the Arizona Supreme Court, but it refused to consider the claim.

Lopez then returned to the district court and sought to amend his habeas petition to add this claim. The district court rejected the proposed amendment, citing the state court's procedural default of the claim. Lopez, however, argues that the state court's reliance on Rule 32.2(a)(3) was in error, because he had brought his claim under Rule 32.1(h), and Rule 32.2(b) prohibits the state court from applying Rule 32.2(a)(3) to 32.1(h) claims. Rule 32.2(b) provides:

> Rule 32.2(a) [preclusion from relief] shall not apply to claims for relief based on Rules 32.1(d), (e), (f), (g) and (h). When a claim under [these rules] is to be raised in a successive or untimely post-conviction relief proceeding, the notice of post-conviction relief must set forth the substance of the specific exception and the reasons for not raising the claim in the previous petition or in a timely manner. If the specific exception and meritorious reasons do not appear substantiating the claim and indicating why the claim was not stated in the previous petition or in a timely manner, the notice shall be summarily dismissed.

---

[9]The state court actually cited "32.1(a)(3)," which does not exist; the citation is apparently a typographical error, as Lopez acknowledges.

The district court reasoned that, although the state court did not cite Rule 32.2(b) or 32.1(h) in its ruling, the court's dismissal of the claim under Rule 32.2(a)(3) meant it "must have necessarily concluded that the claim failed to constitute an exception to Rule 32.2(a) preclusion as set forth in Rule 32.2(b)."[10] In other words, in the district court's view, the state court had interpreted Rule 32 to require dismissal under 32.2(a) if the showing required under 32.2(b) was not satisfied.

[10] The district court's interpretation is entirely plausible. Although the first sentence of Rule 32.2(b) states that "Rule 32.2(a) shall not apply" to claims for relief based on certain subsections, including 32.1(h), the rule goes on to state various requirements and concludes that, "[i]f the specific exception and meritorious reasons do not appear substantiating the claim and indicating why the claim was not stated in the previous petition or in a timely manner," the claim is to be dismissed. As the district court noted, state courts are presumed to know and correctly apply state law. *See Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *Beaty v. Stewart*, 303 F.3d 975, 986 (9th Cir. 2002). Moreover, Lopez specifically argued to the Arizona Supreme Court that the trial court had erred in finding the claim precluded, and the Court did not reverse the ruling.

[11] We grant the COA because the district court's procedural determination is debatable among reasonable jurists and Lopez has facially alleged a deprivation of a constitutional right, but we nonetheless affirm the district court's ruling.

---

[10]Lopez now argues that the district court erred by relying on a theoretical but unstated procedural bar; however, this is not quite what the district court did. Rather, the district court concluded that the state court must have found the Rule 32.2(b) exception did not apply to save Lopez's new petition, and that this was why the state court had dismissed under the ordinarily applicable Rule 32.2(a).

This court, when sitting as a habeas court, generally respects state court determinations of state law. *See Powell v. Lambert*, 357 F.3d 871, 874 (9th Cir. 2004); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law). We have previously recognized an exception to this deference if the state court's interpretation is "clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of rights guaranteed by the Constitution." *Knapp v. Cardwell*, 667 F.2d 1253, 1260 (9th Cir. 1982). As discussed above, there are ways to construe the state court's ruling that would not make it "clearly untenable," and we are therefore bound by the state court's interpretation and application of its own procedural rules.[11] The district court properly declined to permit Lopez to amend his petition in light of the state court's ruling.

## V.  Defense Counsel's Failure to Object to Evidence of Prior Injuries

During the guilt phase of Lopez's trial, the medical examiner, Dr. Henry, testified that Anthony suffered from several healing injuries, including rib fractures and bruises about his face and torso. Lopez argues that his counsel should have moved to exclude this evidence under Arizona Rule of Evidence 404(b), as evidence of other crimes, wrongs, or acts not admissible to prove the character of a person, and asks this court to grant a COA on this issue. He argues the evidence was not admissible under any of the exceptions, such as to prove absence of mistake or accident, because the state had not proven by clear and convincing evidence that Lopez caused the other injuries. *See State v. Nordstrom*, 25 P.3d 717,

---

[11]Lopez does not otherwise challenge the application of Rule 32.2(a) as an "independent and adequate" state law ground, *see Stewart v. Smith*, 536 U.S. 856, 861 (2002), and *Ortiz v. Stewart*, 149 F.3d 923, 931-32 (9th Cir. 1998), nor does he attempt to demonstrate cause and prejudice for the procedural default.

736 (Ariz. 2001). Lopez contends that had this evidence been excluded, there is a reasonable probability that the jury would have convicted him of a lesser-included offense—reckless child abuse—which is a non-capital felony.

This claim was raised in state post-conviction proceedings and denied on the merits. The state court concluded that defense counsel's decision not to object to the admission of the evidence did not fall below an objective standard of reasonableness, and that even if the evidence was not admissible, there was no reasonable probability of a different outcome. The district court concluded that the state court's ruling was neither contrary to nor an unreasonable application of clearly established federal law. We grant the COA because the issue is debatable among jurists of reason, but we affirm the district court's decision.

**[12]** The first prong of *Strickland* considers whether Lopez's counsel fell below an objective standard of reasonableness by failing to object to the evidence of prior injuries as Rule 404(b) evidence. 466 U.S. at 687-88. Even if we assume that the state court unreasonably determined that Lopez's counsel was not deficient for failing to at least object to this evidence, to satisfy the second prong of *Strickland*, Lopez must also demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Dr. Henry's testimony clearly focused on the three major injuries that ultimately resulted in Anthony's death — injuries to his head, chest and abdomen. Occasional references to older bruises or healing rib fractures were made when describing the condition of the body at the time of the autopsy. Dr. Henry also testified that the abdominal injuries might have occurred more than a day earlier, but that it was also possible they had been inflicted around the same time as the head injuries. But the truly damaging portion of Dr. Henry's testimony was not descriptions of other minor bruises

or injuries—it was his consistent testimony that Anthony's three serious injuries were not consistent with accidental injuries, were highly unlikely to have been caused by a falling nightstand as described by Lopez, and were not inflicted by a single blow, but by separate and very forceful blows to the head, chest and abdomen.

**[13]** Perhaps more importantly, the prosecution did not use any of Dr. Henry's testimony about prior injuries to argue Lopez's state of mind. The only reference to the prior bruises in the closing argument was to point out that the victim's mother was either not particularly observant or not credible. Instead, the focus of the closing argument mirrored the crux of Dr. Henry's testimony: the injuries Anthony suffered were not accidental, they required a great deal of force, and they likely required repetitive blows, which, the prosecution argued, required effort and thought. The prosecution argued that the severity of Anthony's injuries simply did not permit a finding of recklessness—that Lopez had either intentionally and willfully inflicted these injuries on the child, or that it was some freak accident, but that there was no in between. The prosecution also pointed out the inconsistencies in Lopez's statements to police, his reluctance to take the child to the hospital, and that Lopez's explanation of what happened was inconsistent with the medical evidence.

**[14]** Although Lopez argues that the jury could have found recklessness but for the allegedly improper testimony about the prior bruises, we agree with the district court that the state court was not objectively unreasonable in determining that there was no reasonable probability of a different guilt phase outcome based on this record. We therefore affirm the district court's denial of Lopez's petition on this claim.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

THOMAS, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's holdings in Parts II-V of the majority opinion. That is, I agree that the district court erred in concluding that Lopez's ineffective assistance of counsel claims for failure to investigate and present mitigating evidence were unexhausted, and I agree that Lopez is not entitled to remand or relief on his claims that the Arizona Supreme Court denied him meaningful appellate review, that his lawyer was deficient in failing to challenge Dr. Hobeich's testimony, or that his lawyer was deficient in failing to object to evidence of prior injuries.

However, because I conclude that Lopez has successfully demonstrated an unreasonable application of *Eddings v. Oklahoma*, 455 U.S. 104 (1982), based on both the trial judge's and the Arizona Supreme Court's failure to consider his mens rea as a mitigating factor, I respectfully dissent from Part I of the majority's opinion.

I

I share the concern raised by Chief Justice Feldman in his special concurrence, namely the lack of any trial court findings on mens rea. The lack of such a finding creates a distinct constitutional problem under *Eddings* because there is no evidence that the Arizona courts actually considered mens rea as a mitigating factor.

This case is an outlier in our death penalty jurisprudence because the record is undisputed—and all parties seem to concede—that Lopez never intended to kill his son. Throughout trial, the prosecution emphasized that child abuse felony murder does not include an intent element. During the sentencing hearing, after Lopez's counsel stressed Lopez's lack of specific intent as a mitigating factor, the prosecution's only argument in rebuttal was the following analysis: that Lopez

knew from experience that children are vulnerable to injury, that Lopez intended to injure Anthony, and that "we can *infer* that [Lopez] intended the damage [the injuries] caused because of his very familiarity with children." (emphasis added). Then, while arguing before the Arizona Supreme Court on direct appeal, the prosecution "conceded that there was little or no evidence of intent to kill and that the most probable explanation for the child's death was that Defendant became enraged, lost control, and beat the child quite seriously." *State v. Lopez*, 847 P.2d 1078, 1092 (Ariz. 1992) (Feldman, C.J., specially concurring). There was also evidence introduced at trial that Lopez attempted to administer CPR when Anthony stopped breathing and that Lopez was visibly upset by Anthony's death. This behavior is inconsistent with an intentional homicide.

Although the formation of a specific intent to kill is not a prerequisite to the imposition of a death penalty, *Tison v. Arizona*, 481 U.S. 137 (1987), the lack of a specific intent to kill is relevant to whether the death sentence is appropriate for an individual defendant. Notably, most child abuse felony murderers do not receive a sentence even approaching death, even though all such murders are undoubtedly death penalty eligible.

In short, this case is an unusual one. Lopez received the harshest sentence that the state is empowered to impose even though he never intended for his victim to die. This fact does not exempt him from the death penalty by any means. However, it does call into question the state courts' assessment of mitigation.

## II

Under *Eddings*, a sentencer contemplating the death penalty has a constitutional obligation to consider, "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant

proffers as a basis for a sentence less than death." 455 U.S. at 110 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)). Applying *Eddings* to this case, both the sentencing judge and the Arizona Supreme Court had a constitutional duty, before choosing or affirming a death sentence, to consider all mitigating factors that Lopez's trial counsel proffered.

During Lopez's sentencing hearing, his trial counsel spent considerable time arguing that Lopez's lack of specific intent militated against the death sentence. There is therefore no doubt that *Eddings* required the trial judge and the Arizona Supreme Court to consider Lopez's mens rea when deciding whether to impose and whether to affirm the death penalty. The only question before us, therefore, is whether or not the state courts did, in fact, consider Lopez's argument.

In reviewing the state court record for a potential *Eddings* violation, this court must, as the majority correctly notes, presume that the trial judge and the state Supreme Court actually considered all of the mitigating arguments that were presented. This presumption arises, first and foremost, from a blanket presumption that state judges know and follow the law. It arises secondarily in this case from the trial judge's multiple assurances on record that she was considering all of Lopez's proffered evidence and arguments. *Parker v. Dugger*, 498 U.S. 308, 315 (1991) ("We must assume that the trial judge considered all this [mitigation] evidence before passing sentence. For one thing, he said he did."). Under *Parker*, we must presume that the trial judge was neither disingenuous nor mistaken when she stated that she considered all mitigating arguments.

The *Parker* presumption, however, is neither conclusive nor irrebuttable. In *Parker* itself, the Supreme Court did not rely on the trial judge's assurance that he had considered all mitigating evidence. Rather, the Court examined the entire record, reconstructing the trial judge's decision-making process to determine whether or not that process included consid-

eration of non-statutory mitigating factors. The Court then rejected the *Eddings* claim, not because the trial judge had made a bare statement that he had considered mitigating evidence, but because the trial judge's final decision was inexplicable without reference to that evidence. Specifically, the Supreme Court pointed out that the trial judge had overridden the jury's recommended life sentence for only one of the two murders involved in the case. Although Parker had committed a dual homicide, he received the death sentence for one murder and a life sentence for the other. Because the aggravating circumstances applied to both homicides, the Supreme Court reasoned that the only explanation for the differential sentencing was that the trial judge had considered non-statutory mitigating circumstances and had determined that those circumstances justified leniency with respect to only one of the murders. *Parker*, 498 U.S. at 316-17. In *Parker* itself, therefore, the initial presumption that the trial judge considered all mitigators was only a starting point. The presumption was not — and is not — conclusive.

Furthermore, the *Parker* presumption is easily rebuttable. As Justice O'Connor wrote in her *Eddings* concurrence, the qualitatively different nature of a death sentence requires reviewing courts "to remove any legitimate basis for finding ambiguity concerning the factors actually considered by the trial court." 455 U.S. at 119 (O'Connor, J., concurring). As a result, if there is any legitimate reason to believe that the trial judge excluded a mitigating factor from her consideration, then we should remand for resentencing. The consequences of error in a death case are too great to allow for speculation or fudging.

In the end, then, the *Parker* presumption is merely a rule for allocating burdens, which will determine the outcome only if the defendant or habeas petitioner offers no legitimate reason to doubt its validity in a particular case. If, however, a habeas petitioner can point to any legitimate evidence in the record that indicates the trial judge's exclusion of any factor

or evidence, then this court should grant the writ and remand for resentencing.

## III

In this case, Lopez offers two theories to rebut the *Parker* presumption. First, he points to one instance in the record in which the trial judge stated that she would consider only those mitigating factors that were presented during the aggravation/mitigation hearing, impliedly to the exclusion of mitigating evidence adduced at trial. Lopez argues that that one statement should suffice, per Justice O'Connor's admonition against speculation, to undermine this court's confidence in the trial judge's *Eddings* compliance.

As the majority correctly concludes, Lopez takes that statement out of context. The trial judge's only point was that she would, consistently with Lopez's motion to strike, ignore certain statements that were included in the presentence report. As she made clear at several other points in the proceeding, the trial judge did not mean to imply that she would neglect mitigating evidence adduced at trial. The statement that Lopez emphasizes, therefore, does not introduce speculation or confusion when it is read in the context of the entire trial record. Lopez's first attempt to rebut the *Parker* presumption fails.

But Lopez offers a second theory, which is more compelling. Lopez directs our attention to Chief Justice Feldman's separate concurring opinion in the Arizona Supreme Court's decision of his direct appeal, which noted that the trial judge failed to make a statutorily required finding as to the potential mitigating effect of Lopez's mens rea. *State v. Lopez*, 174 Ariz. 131, 145-46, 847 P.2d 1078 (1992) (Feldman, C.J., specially concurring). In his separate opinion, Chief Justice Feldman noted that A.R.S. § 13-703(D) requires trial judges to articulate specific findings with respect to any statutory mitigating factor that is present in the case. He also noted that the statute lists as a mitigating factor " 'any of the circumstances

of the offense.' " *Id.* at 145 (quoting A.R.S. § 13-703(G)). Chief Justice Feldman then observed that a highly relevant circumstance of Lopez's offense was the possibility that Lopez "may never have formed an intent to kill." *Id.*

Contrary to the statutory articulation requirement, Lopez's trial judge never made a specific finding as to whether Lopez did, in fact, intend to kill Anthony or as to whether Lopez's lack of specific intent was or was not sufficiently mitigating to call for leniency. Because the trial judge did not articulate a specific finding related to the statutory mitigating factor of Lopez's intent, Chief Justice Feldman wrote that he preferred to remand the sentence for entry of that finding.

In our determination of whether the trial judge actually considered all of Lopez's proffered mitigating theories, the Arizona Chief Justice's opinion is highly relevant. The trial judge's failure to comply with statutory articulation requirements indicates that she might have failed to consider Lopez's lack of specific intent as a mitigating factor in the § 13-703 balance. That is, if the trial judge had determined either that Lopez actually intended to kill Anthony or that Lopez's lack of specific intent to kill was insufficiently mitigating to call for leniency, then she should have articulated a § 13-703(D) finding to that effect. Because the trial judge did not make any such finding, we must conclude that one of two things happened: either she made a state statutory error by failing to enter a required finding or she made a federal constitutional error by failing to consider intent as a mitigating factor.[1]

---

[1]The majority here concludes: "Of course, the trial court did not specifically discuss *any* of the mitigating evidence that Lopez presented, so a failure to discuss this factor does not necessarily indicate it was not considered." Maj. Op. at 7335. As should be clear from this discussion and from Chief Justice Feldman's opinion, the failure to make an intent finding, unlike the failure to make findings related to non-statutory mitigators, is a legal error, not mere churlishness. That failure, therefore, has far more significance than the majority opinion assigns to it.

I would conclude that the latter possibility is the more likely, for two reasons. First, as noted, *Eddings* requires us to remand if there is any legitimate basis for finding that the sentencer neglected a mitigating factor. Even taken alone, the trial judge's statutory failure raises some ambiguity as to whether she included Lopez's mens rea in her aggravation/ mitigation balance. Because we should err on the side of caution, avoiding speculation, the statutory failure alone is enough to justify a remand.

Second — and more compellingly — there is a strong commonsensical likelihood, which gains support from the record, that neither the trial judge nor the state Supreme Court believed that intent should count as a mitigating factor. At the time of Lopez's sentencing, the United States Supreme Court had recently decided *Enmund v. Florida*, 458 U.S. 782 (1982), and had even more recently decided *Tison v. Arizona*, 481 U.S. 137 (1987). Both of those cases considered the role that a defendant's intent should play in an Eighth Amendment determination of whether the death penalty is an excessive punishment for a particular defendant. Specifically, *Enmund* held that, under the Eighth Amendment, the defendant must have a general intent to kill before he may be given a death sentence. *Tison* then clarified *Enmund*, holding that a reckless disregard for someone's life, combined with an intent to engage in conduct that endangers that person's life and ultimately results in his death, is sufficient to allow for the death penalty.

As the federal district court found in this case, there can be little doubt that Lopez's intentional child abuse included a reckless disregard for Anthony's life, sufficient to satisfy Eighth Amendment requirements under *Tison*. But the conclusion that Lopez had a sufficiently culpable mens rea to satisfy *Tison* is not the same as the conclusion that the holistic circumstances of the crime and of the defendant, taking a limited mens rea into account, justify a death penalty. That is, the defendant's intent should play a dual role at the sentencing

phase. Intent is relevant in the first instance to determine whether the death penalty is even on the table, and it is relevant in the second instance to determine whether, on balance, the aggravating and mitigating characteristics of the defendant and the crime militate in favor of (or against) leniency. The individualized analysis that *Eddings* requires must include holistic analysis of whether the characteristics of the defendant and the circumstances of the crime — including the defendant's mens rea — justify a death penalty.

In this case, the record strongly implies that the trial judge considered Lopez's intent argument only in its first role, as a *Tison* challenge. The Arizona Supreme Court then repeated that error by neglecting the argument altogether, presumably because the court assumed that intent was no longer relevant in light of Lopez's failure to bring a *Tison* challenge on direct appeal.

## A

The trial judge's only reference to Lopez's intent was her statement that Lopez "willfully and intentionally physically abused the child entrusted to his care and caused his death." This statement makes perfect sense as a *Tison* finding; it clearly concludes that Lopez intended to engage in conduct that endangered Anthony's life, and it clearly concludes that the dangerous conduct caused Anthony's death. Under *Tison*, that is all that the Eighth Amendment demands.

As Chief Justice Feldman concluded, however, the trial judge's statement falls far short of a § 13-703(D) finding. First, the grammar of the statement makes it difficult if not impossible to determine whether the intent finding attaches only to abuse or also to homicide. That is, the trial judge might have meant only that Lopez willfully and intentionally abused Anthony and that the intentional abuse actually (though perhaps unintentionally) caused Anthony's death. On the other hand, she may have meant that Lopez willfully and

intentionally physically abused Anthony and *willfully and intentionally* caused Anthony's death.[2] Because of its phrasing, the finding is, as Chief Justice Feldman believed, too ambiguous to satisfy § 13-703(D). The judge's statement does not draw a clear conclusion as to whether Lopez intended for his son to die.

Second, the statement does not, as § 13-703(D) requires, include any articulation of the finding's effect on the overall § 13-703 balance. That is, even assuming that the trial judge's statement sufficiently clarified that Lopez did, in fact, intend to kill his son, the trial judge should also have stated — explicitly on record — the resulting conclusion that Lopez's proffer failed to provide a mitigating circumstance. In other words, if the trial judge had considered Lopez's argument as a mitigating factor — and not just as a *Tison* challenge — she would have said more.

---

[2]Interestingly, the sentencing transcript and the minute entry, both of which include the intent finding, punctuate the finding slightly differently; an important comma is missing from the minute entry. In the sentencing hearing transcript, the trial judge is quoted with the following commas: "[T]he court finds beyond a reasonable doubt that the defendant, the father of the child, Anthony, willfully and intentionally, physically abused the child entrusted to his care and caused his death." In the minute entry, however, the trial judge wrote: "THE COURT FINDS, as to Count 2, FIRST DEGREE MURDER, beyond a reasonable doubt that the defendant, father of the child Anthony, willfully and intentionally physically abused the child entrusted to his care and caused his death." The comma following "willfully and intentionally" in the sentencing transcript gives that phrase an independent and lasting significance, such that it might be read to attach to both halves of the following phrase. The absence of the comma in the written order is then significant since "willfully and intentionally" becomes a seamless part of the immediately following phrase, "physically abused the child entrusted to his care." That phrase is then separated from the murder finding by the conjoining "and," such that the "willfully and intentionally" language might not carry over the "and" to attach to the homicide. Reading the minute entry, which is the finding that the judge herself might have been involved in punctuating, it seems highly possible that the intent finding attached only to abuse, not to murder.

In sum, the trial transcript raises a real possibility that the judge took Lopez's argument only as a *Tison* challenge, failing to consider the same argument in its second role as a statutory mitigator. Indeed, the transcript provides no support—except by speculation—that the trial judge specifically considered mens rea as a mitigating factor.

### B

On direct appeal, the Arizona Supreme Court's majority opinion implicitly confirmed this view of the trial record and ultimately repeated the error. The Supreme Court's opinion strongly implied that the majority found no specific intent to kill, but the opinion proceeded to exclude that finding from its consideration of mitigating factors.

### 1

Although the Arizona Supreme Court made no specific intent finding,[3] the majority opinion did strongly indicate its belief that Lopez did *not* intend to kill Anthony. The court's implication to that effect came in its analysis of a statutory aggravating factor that was based on the finding that Lopez was in a "heinous and depraved state of mind when he beat Anthony." *Lopez*, 174 Ariz. at 144. As the Supreme Court noted, there are five circumstances that may support a finding of heinousness and depravity: "(1) the murderer's relishing of the murder; (2) the infliction of gratuitous violence on the victim; (3) the needless mutilation of the victim; (4) the senselessness of the murder; and, (5) the helplessness of the victim." *Id.* (citing *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983)). The first three of those factors, if present, would certainly demonstrate a specific intent to kill; only someone intent on killing would relish the act, gratuitously beat the victim, and needlessly mutilate the body. But the last

---

[3]As noted, Lopez did not raise a *Tison* challenge on direct appeal. The Supreme Court, therefore, did not even make a specific *Tison* finding.

two circumstances — the senselessness of the murder and the helplessness of the victim — do not indicate anything about the defendant's specific intent. A vehicular manslaughter of an infant passenger, for example, clearly would involve the senseless death of a helpless victim without involving a malicious intent on the part of the intoxicated driver.

For our purposes, it is therefore highly relevant that the Arizona Supreme Court relied *solely* on the last two factors when upholding the finding of heinousness and depravity in Lopez's case. The court's conclusion that none of the first three factors were present in this case strongly implies that the court found little to no evidence of specific intent to kill. *Id.* In fact, the evidence that the Arizona Supreme Court cited to support its finding of senselessness was the very evidence that Chief Justice Feldman cited when arguing that Lopez probably did not intend to kill his son. In the words of the Supreme Court's majority opinion: "The murder of Anthony was senseless. Lopez admitted that after he had given Anthony a bath and was putting lotion on him, the infant 'peed, so I smacked him.' " *Lopez*, 174 Ariz. at 144. This finding is exactly the same as the concurring opinion's finding that "the most probable explanation for the child's death was [not that Lopez intended to kill Anthony, but rather] that Defendant became enraged, lost control, and beat the child quite seriously." *Id.* at 145 (Feldman, C.J., specially concurring). In short, the Supreme Court majority apparently could not support the aggravating factor of heinousness and depravity by reference to evidence of intent; on the contrary, the majority opinion implicitly agreed with the concurrence's view that the murder, while senseless, was likely unintentional.

The upshot of this discussion is that the Arizona Supreme Court's logic confirms the view that this case probably involved — and the trial judge probably found — intentional abuse resulting in death, not intentional murder. Although Lopez's mens rea was sufficiently culpable to allow a death sentence under *Tison* and to support a finding of heinousness

and depravity, neither of the state courts found that Lopez actually intended for his son to die.

2

After implicitly accepting that Lopez did not intend to kill his son, the Arizona Supreme Court's majority opinion then completely excluded that factor from its consideration of mitigating evidence. The majority opinion noted only that "[t]he vast majority of the mitigation evidence presented by Lopez centered on his being a good parent and on the fact that he cared for children and never acted inappropriately with them." *Lopez*, 174 Ariz. at 145. The opinion then easily disposed of that mitigating argument — affirming the trial court's rejection of Lopez's character evidence — by noting that Lopez had another conviction for child molestation, which was before the trial judge at the time. But the Arizona Supreme Court's review and rejection of Lopez's character evidence comprised its entire consideration of mitigating factors. In the three paragraphs in which the majority opinion considered mitigation, there is not a single mention of Lopez's mens rea.

The absence of Lopez's intent argument from the Supreme Court's analysis is particularly telling in light of the special concurrence. The entire raison d'etre of Chief Justice Feldman's opinion was to point out that § 13-703(G) required the trial judge to consider Lopez's mens rea as a mitigating factor. The majority opinion completely (though silently) rejected that argument. As noted, however, the majority implicitly agreed with — and certainly made no effort to rebut — the concurrence's conclusion that Lopez probably did not intend to murder his son, thereby indicating that the basis for disagreement between the majority and the concurrence could not have been the factual conclusion. Rather, as indicated by the majority's complete failure to include intent in its discussion of mitigating evidence, the basis for disagreement must have been a question as to whether mens rea counts as a statutory mitigator at all. The majority of the Arizona Supreme

Court apparently believed that it did not. As previously noted, that belief was not unfathomable at the time, given that the United States Supreme Court had recently given mens rea a unique role in death penalty decision making. The Arizona Supreme Court might have believed that *Enmund* and *Tison* removed mens rea from the aggravation/mitigation balance, giving that factor an entirely separate role.

Nevertheless, by excluding Lopez's intent argument from its consideration of mitigating factors, the majority opinion committed an even clearer *Eddings* violation than the trial court. Although the trial transcript does not include any listing of mitigating factors — thereby making it somewhat difficult to determine which factors actually entered the trial judge's thought process — the Supreme Court's majority opinion specifically mentions the mitigating factors that it considered and clearly neglects Lopez's (and Chief Justice Feldman's) intent argument.

C

In conclusion, Chief Justice Feldman's concurring opinion sheds important light on the trial judge's and the majority opinion's thought processes. Neither the trial court nor the appellate court found that Lopez *did* intend to kill Anthony; the Supreme Court's majority opinion implied that Lopez probably did *not* intend to kill Anthony; and neither court made any finding as to the role that Lopez's potential or actual lack of intent played in its analysis of mitigating factors. Because a finding as to mitigation is statutorily required whenever the courts consider mens rea as a mitigating factor, the failure to make the required findings is sufficient in itself to rebut the *Parker* presumption that the courts actually considered Lopez's proffer. Furthermore, in this case, the record indicates that both the trial judge and the Arizona Supreme Court took Lopez's intent argument only as a *Tison* challenge, neglecting to reevaluate the same argument in its second role as a mitigating factor. There is legitimate — indeed, strong —

record evidence to support the conclusion that both courts, contrary to *Eddings*, failed to consider Lopez's mens rea in the § 13-703 balance.

Particularly given Justice O'Connor's admonition against speculation, I would conclude that Lopez has demonstrated an *Eddings* violation.

## IV

The final question is whether, under AEDPA, the state courts' failure to consider intent as a mitigating factor constitutes an "objectively unreasonable,"[4] rather than simply an "incorrect or erroneous," application of *Eddings*. *See Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 410, 412, 120 S.Ct. 1495 (2000)). In this case, there can be little doubt that it does.

*Eddings* held, without qualification, that due process requires a sentencer to consider *all* mitigating factors that a defendant proffers. 455 U.S. at 114 ("The sentencer, and the [appellate court] on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."). The *Eddings* opinion also relied on *Lockett v. Ohio*, 438 U.S. 586 (1978), which explicitly held that the sentencer must consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S.

---

[4]Because neither the trial judge nor the Arizona Supreme Court made any specific mention of the *Eddings* standard, I will not analyze the question under AEDPA's "contrary to" clause. *See* 28 U.S.C. § 2254(d)(1). Although it appears that the state courts applied an entirely incorrect legal standard by assuming that intent is not a mitigating factor under *Eddings*, I cannot conclude with certainty that they did so. I will therefore confine my analysis to the stricter standard, which allows reversal only if the state courts' decisions "involved an unreasonable application" of the correct federal rule. *Id.*

at 604. There is no potential for reasonable minds to differ on the question of whether the defendant's intent falls within the scope of *Eddings* and *Lockett*. It does.

The dual role that mens rea must play in death penalty cases does not undermine this conclusion; in fact, it strengthens it. The fact that the Eighth Amendment contains a minimum culpability requirement demonstrates the critical importance of the defendant's mens rea in a death penalty decision. Although intent's dual role makes it *understandable* that a sentencing judge might fail to switch hats after making an *Enmund* finding, the dual role does not make the same failure *reasonable*. Even after establishing eligibility for the death penalty, *Eddings* clearly requires the sentencing judge to continue evaluating the whole crime, including mens rea, to determine whether the death penalty is actually appropriate for the individual defendant.

In this case, the applicable state law and the arguments presented at sentencing make the state courts' failures all the more unreasonable. First, to the extent that the *Lockett* requirement might have been ambiguous, the same requirement was codified in Arizona's criminal statutes. As Chief Justice Feldman noted, A.R.S. § 13-703(G) specifically requires Arizona trial judges to consider "any of the circumstances of the offense." The trial judge's neglect of Lopez's mens rea, therefore, was not only a misapplication of Supreme Court precedent but also a defiance of state statute, enhancing the unreasonableness of the *Eddings* violation.

Second, Lopez clearly proffered — indeed, emphasized — his mens rea as a mitigating factor. Although Lopez focused primarily on his good character during the aggravation/mitigation hearing, his counsel focused almost exclusively on intent throughout the sentencing hearing. In fact, in his last statement to the trial judge before the sentence was imposed, Lopez's attorney said:

> I think the one single most important thing here, in this case, is that there's been no showing, at all, that George ever intended that baby to die[.] . . . I would say that everything points to the contrary. That if that were his intent, there would be different facts before you and, under these circumstances, I think he's going to be punished enough by getting the sentence that the Court has to impose.

Given that Lopez's intent argument was the last thing — and "the one single most important thing" — that his attorney offered in mitigation, the trial judge's and the Arizona Supreme Court's failure to consider it was objectively unreasonable.

I therefore would conclude that Lopez is entitled to relief under AEDPA on his certified *Eddings* claim, and I would grant the writ of habeas corpus with respect to that claim, remanding his case to the Arizona courts for resentencing.